**EASTERN PARALYZED VETERANS ASSOCIATION, INC., on behalf of its members and Long Island Housing Services, Inc., Plaintiffs,**

v.

**LAZARUS–BURMAN ASSOCIATES, Jerome Lazarus, Jan Burman, L.B. Mitchel Field Inc., L.B. Mitchel Field Associates, L.P., and Simplex Industries, Inc., Defendants.**

No. CV 00–2493.

United States District Court,
E.D. New York.

March 12, 2001.

miss by Simplex, pursuant to Rule 12(b)(1), based on an allegation that the statute of limitations has expired on the plaintiffs' action.

Kleo J. King, John P. Herrion, Jackson Heights, NY, for plaintiffs.

Farrell Fritz, P.C., Uniondale, NY, by A. Kathleen Tomlinson, Marie Zweig, of counsel, for defendants Lazarus–Burman Associates, Jerome Lazarus, Jan Burman, L.B. Mitchel Field Inc., L.B. Mitchel Field Associates, L.P.

Wormuth & Mey, Scranton, PA, by Michael R. Mey, of counsel, for defendant Simplex Industries, Inc.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This lawsuit arises out of contentions by Eastern Paralyzed Veterans Association, Inc. ("EPVA" or a "plaintiff") and Long Island Housing Services, Inc. ("LIHS" or a "plaintiff") (collectively, the "plaintiffs") that Lazarus–Burman Associates ("LBA" or a "defendant"), Jerome Lazarus ("Lazarus" or a "defendant"), Jan Berman ("Berman" or a "defendant"), L.B. Mitchel Field, Inc. ("Mitchel Field" or a "defendant"), L.B. Mitchel Field Associates, L.P. ("Mitchel Field Associates" or a "defendant") (collectively, the "Lazarus–Burman defendants"), and Simplex Industries, Inc. ("Simplex" or a "defendant") (collectively, the "defendants") constructed a 438–unit senior-citizen housing development, The Meadows at Mitchel Field ("The Meadows"), in violation of the accessibility requirements of the Fair Housing Act of 1986 as amended, 42 U.S.C. § 3601 et. seq. (the "FHA") and the regulations promulgated thereunder. Presently before the Court are: (1) the defendants' motion to dismiss pursuant to 12(b)(1) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") based on the plaintiffs' alleged lack of standing to sue; and (2) a motion to dis-

### I. BACKGROUND

The following facts are taken from the complaint. In the early 1990's, LBA purchased a 20–acre parcel of land from Nassau County for the sum of $5,000,000. LBA intended to build The Meadows, an affordable housing development for people over the age of 62, through the Town of Hempstead's "Golden Age" program. Under the Golden Age program, the Town of Hempstead offered real estate tax abatements that translated into lower monthly carrying costs for purchasers of units at The Meadows. The program also permitted special high-density zoning.

In 1996, LBA submitted floor plans for The Meadows to the Town of Hempstead Department of Buildings. The Chief Buildings Inspector approved the plans on or about October 31, 1997. Thereafter, the Lazarus–Burman defendants built The Meadows using pre-fabricated modular units designed and constructed by Simplex.

The plaintiffs contend that the completed units at The Meadows are not accessible to people who use wheelchairs, because: (1) every ground-floor unit has three steps leading to the entrance door; (2) the thermostat in every unit is above the accessible reach of a person sitting in a wheelchair; (3) in all of the "C units," a door into the bathroom and the door into the storage room are only 28–inches wide; (4) in all of the "B units," the door to the walk-in closet in bedroom # 1 is 24–inches wide; and (5) in all of the "A units," one of the doors to the bathrooms is 28–inches wide.

The plaintiffs argue that this type of construction violates their rights to accessible housing under the FHA, because the FHA and its regulations require that the following design features be included in

multifamily dwellings: (1) one entrance that is accessible by wheelchairs; (2) interior doorways that are sufficiently wide to allow passage by people in wheelchairs; (3) accessible routes through the unit; (4) light switches and thermostats that are in locations that can be reached by wheelchair users; (5) reinforcements in bathroom walls to allow for the later installation of grab bars; and (6) kitchen and bathroom areas that are large enough for a person in a wheelchair to maneuver about the unit (*see* Complaint ¶¶ 25, 29 (citing 42 U.S.C. § 3604(f)(3), 24 C.F.R. ¶ 100.205)).

EPVA is a not-for-profit corporation with over 2,000 members who live throughout the northeastern United States, including the New York City area and Nassau and Suffolk Counties. All of EPVA's members are veterans of the United States armed forces and are victims of spinal cord injuries, and almost all of EPVA members use a wheelchair. The complaint describes EPVA's mission as follows:

> Among EPVA's purposes are to assist its members and other individuals with disabilities in leading full, active, and productive lives; to assure its members proper and dignified medical care, and effective reconditioning and rehabilitation; and to assure its members and other individuals with disabilities have full access to housing, transportation, employment, recreational facilities, and other facilities open to persons without disabilities. Toward these ends, EPVA assists and cooperates with both governmental and private entities in making their facilities accessible to persons with disabilities, including wheelchair users. Where necessary, EPVA has brought litigation to assure compliance with federal, state and local laws mandating access for persons with disabilities.

(Complaint ¶ 6).

The complaint also describes LIHS:

> 7. ... [LIHS] is a private not-for-profit fair housing advocacy and enforcement agency servicing Nassau and Suffolk Counties. Its primary objectives are to promote racial and economic integration, to reduce and eliminate housing discrimination, to promote equal housing opportunities, and to promote the availability of affordable and accessible housing. LIHS pursues these goals through counseling clients in such areas as fair housing rights and resources, landlord/tenant rights, government assisted programs and homelessness prevention, as well as mortgage default, pre-purchase and rental strategies. LIHS promotes fair housing enforcement and voluntary compliance with fair housing laws by conducting fair housing investigations, including testing, providing education and outreach for housing consumers and industry related providers and serving as a clearinghouse for information.

(Complaint ¶ 7).

The following factual allegations are taken from affidavits submitted to the Court in conjunction with the motions to dismiss. *See Antares Aircraft v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991) ("On a motion under [Rule] 12(b)(1) challenging the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits."), *vacated on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992).

In order to purchase a unit at the Meadows, individuals must show proof that they are over the age of 62 and that their income does not exceed $45,000 for single persons or $55,000 for couples (*see* Burman affidavit ¶ 4). As per the Town of Hempstead's requirements, two-bedroom units on the second floor could not sell for more than $107,000, and two-bedroom units on the first floor could not sell for more than $112,000 (*see* Burman affidavit ¶ 4).

The Lazarus–Burman defendants claim that at the time The Meadows units were sold, a handicap package was offered to all prospective buyers (*see* Burman affidavit ¶ 8). According to the Lazarus–Burman defendants, only two prospective buyers inquired about the package, and none of the ultimate buyers purchased the handicap package (*see* Burman affidavit ¶ 9). The Lazarus–Burman defendants also state that none of the existing unit owners at The Meadows has asked for the handicap package (*see* Burman affidavit ¶ 10). Burman maintains that one unit owner requested a ramp be built after she had moved into her unit, and Burman claims that he built the ramp at his own expense (*see* Burman affidavit ¶ 11).

LIHS alleges that on or about November 13, 1997, Louis Ponticello ("Ponticello"), an individual with a disability, informed LIHS that he had visited The Meadows Sales Office to inquire about purchasing a home, and he was concerned that none of the units was accessible to wheelchairs (*see* Santantonio affidavit ¶ 5). In response to Ponticello's inquiry, Michelle Santantonio ("Santantonio"), the Executive Director for LIHS, "conducted phone testing to [The Meadows] Sales Office to determine whether persons with disabilities were being denied the opportunity to purchase homes at [The Meadows]" (Santantonio affidavit ¶ 6). Santantonio claims that during a telephone call to The Meadows Sales Office on November 24, 1997, she was "informed that there were no accessible apartments for persons with disabilities, and that the development was for active seniors" (Santantonio affidavit ¶ 7). Santantonio notes that Ponticello was not eligible for The Meadows because he did not meet the age requirement (*see* Santantonio affidavit ¶ 8).

Santantonio also claims that Nassau Suffolk Legal Services ("NSLS") relayed to her complaints they had received from residents and prospective purchasers at The Meadows who wished to modify the units in order to make them accessible to people with disabilities (*see* Santantonio affidavit ¶ 10). NSLS told Santantonio that The Meadows had advised one resident that she would have to pay a sum of $2500 to have a ramp installed (*see* Santantonio affidavit ¶ 10). Santantonio also claims that several individuals with disabilities informed NSLS that the sales staff at The Meadows attempted to dissuade them from purchasing units (*see* Santantonio affidavit ¶ 10).

According to Santantonio:

LIHS spends a significant amount of its staff time and resources on counseling clients on a wide array of housing issues ranging from mortgage default to promoting equal opportunity for persons with disabilities to obtain . housing. From April 1999 through June 1999 LIHS, during its investigation of [The Meadows], had to layoff members of its investigative staff due to budgetary constraints. . . . The inaccessibility of [The Meadows] has resulted in a significant diversion of resources at a time in which LIHS was experiencing constraints on staffing and time to further its mission. LIHS' primary mission as an enforcement, advocacy and counseling agency to promote racial and economic integration was frustrated as its energies and time were diverted to the technicalities of accessibility guidelines for new construction.

(Santantonio affidavit ¶¶ 23, 25).

In January 1999, Santantonio contacted Brian Black ("Black"), the Director of Building Codes and Standards at EPVA's Buffalo office, regarding what she believed to be violations of the FHA at The Meadows (*see* Black affidavit ¶ 2). Black and Santantonio reviewed The Meadows floor plans, which they obtained from the Town of Hempstead's Buildings Department, and visited The Meadows where they examined the interior and exterior of the units to determine their accessibility (*see* Santantonio affidavit, ¶¶ 14–22; Black affidavit ¶¶ 3–11).

Black alleges that:

My work on investigating the violations that exist at The Meadows was extremely time consuming and detracted my attention away from other housing complaints, analysis of proposed changes to various national and international building codes. For example, I was not available as a resource to callers with technical and policy questions since I needed to travel to Long Island to investigate the case before the court. Also, my intensive work in March 1999 and September 1999 conflicted with ... seven meetings and the preparation required for each.... The diversion of my time while working on the complaint lodged against The Meadows diverted EPVA's resources and frustrated EPVA's mission. Specifically, I was not available to builders who wish to build facilities that are accessible and in compliance with all applicable laws.

(Black affidavit ¶ 12).

John Herrion ("Herrion"), the Assistant Program Counsel to the Legal Affairs Department of EPVA also states that EPVA became aware of possible FHA violations at The Meadows when Santantonio contacted EPVA on or about January 28, 1999 (see Herrion affidavit ¶ 5). Herrion claims that he wrote several letters and placed several telephone calls in connection with EPVA's investigation of The Meadows, and that such tasks "diverted [his] time from counseling and advocating on behalf of [EPVA's] members to further EPVA's purposes, and has led to time consuming litigation compromising and frustrating pursuit of EPVA's mission" (see Herrion affidavit ¶ 12).

The plaintiffs seek: (1) a final judgment declaring that The Meadows was constructed in violation of the FHA; (2) an injunction requiring the defendants to modify the ground floor units at The Meadows so that they comply with the FHA; (3) a preliminary and permanent injunction prohibiting the defendants from building future multifamily housing in violation of the FHA; (4) a mandatory injunc-tion directing the defendants "to construct multifamily dwelling units so that they are accessible to wheelchair users" (Complaint, p. 12); and (5) attorney's fees, costs and disbursements (see Complaint, p. 12).

## II. DISCUSSION

### A. Standing

As noted above, the defendants move to dismiss the Complaint pursuant to Rule 12(b)(1) on the ground that the plaintiffs lack standing to sue because neither of them has alleged that it was injured in fact.

For the purposes of ruling on a motion to dismiss for want of standing, the Court must accept as true all material allegations in the Complaint, and must draw all reasonable inferences from the Complaint in favor of the plaintiff. See Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir.1992). Notably, however, the Court is not confined to the four corners of the Complaint when making this determination. See Warth, 422 U.S. at 501, 95 S.Ct. at 2206–07 ("[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavit, further particularized allegations of fact deemed supportive of plaintiff's standing."). So that, the Court may look to affidavits and other evidence outside the pleadings to resolve disputed jurisdictional fact issues. See id.; Antares Aircraft, 948 F.2d at 96. "If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." Warth, 422 U.S. at 501–02, 95 S.Ct. at 2207.

In essence, the question of standing is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial

powers on his behalf." *Warth*, 422 U.S. at 498–99, 95 S.Ct. at 2205 (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). The Article III power of the federal judiciary extends only to those cases in which there is a "case or controversy," and, thus, "[a] federal court's jurisdiction ... can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.'" *Id.* at 499, 95 S.Ct. at 2205 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973)); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) (holding that the sole requirement for standing is "the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury'") (quoting *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206). Furthermore, "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Id.*, at 500, 95 S.Ct. at 2206 (quoting *Linda R.S.*, 410 U.S. at 617 n. 3, 93 S.Ct. at 1148); *see Havens*, 455 U.S. at 373, 102 S.Ct. at 1121.

As noted above, the plaintiffs bring this action under the FHA. The portion of that statute relevant to this case makes it unlawful:

(f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter,

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented or made available; or

(c) any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1). Furthermore, for the purposes of section 3604, discrimination includes, among other things:

(C) in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after September 13, 1988, a failure to design and construct those dwellings in such a manner that—

(i) the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;

(ii) all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

(iii) all premises within such dwellings contain the following features of adaptive design:

(I) an accessible route into and through the dwelling;

(II) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

(III) reinforcements in bathroom walls to allow later installation of grab bars; and

(IV) usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

42 U.S.C. § 3604(f)(3)(C).

Under the FHA, any "aggrieved person" may commence a civil action alleging a discriminatory housing practice. *See* 42 U.S.C. § 3613(a)(1)(A). The term, "aggrieved person," refers to any "person who (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i). Furthermore, within the context of the FHA, the word, "person," includes associations and unincorporated organizations. 42 U.S.C. § 3602(d).

An association or organization may assert standing either in a representative capacity on behalf of its members, *see Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342–43, 97 S.Ct. 2434, 2442, 53 L.Ed.2d 383 (1977), or in its

own right. *See Warth,* 422 U.S. at 511, 95 S.Ct. at 2211; *see also Havens,* 455 U.S. at 378–79, 102 S.Ct. at 1124. Here, the caption demonstrates that EPVA sues on behalf of its members while LIHS sues on behalf of itself as an organization.

■ Even in the absence of injury to itself, an association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt,* 432 U.S. at 334, 97 S.Ct. at 2441. Thus, in order to invoke standing in a representative capacity, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211–12 (citing *Sierra Club v. Morton,* 405 U.S. 727, 734–41, 92 S.Ct. 1361, 1365–69, 31 L.Ed.2d 636 (1972)).

■ The Court finds that the EPVA does not have standing to sue in a representative capacity, because the organization has not alleged that the defendants' conduct has injured any of its members' statutory right to be free from discriminatory housing practices. Neither the complaint nor the affidavits submitted in connection with the plaintiff's opposition to the current motions to dismiss contain references to a member's experience in applying for and being denied housing at The Meadows, because of the member's handicap. Nor do the complaint and affidavits include an allegation that an EPVA member was denied access to any part of The Meadows due to the member's handicap. There is no averment that an EPVA member attempted to gain physical access to The Meadows but could not, because the public use and common areas of the development were not sufficiently wide for

wheelchair access. Similarly, there is no allegation that an EPVA member visited someone living at The Meadows but was unable to enter or move about the unit because its doors and hallways were not wide enough to permit the passage of a wheelchair.

EPVA did present the Court with an affidavit from one of its members, Gerard Kelly ("Kelly"), but Kelly simply describes the organization and states, "The three-step entrance to each unit at The Meadows ... prohibits ... EPVA members from accessing these units and thus violates the rights of EPVA members" (Kelly affidavit ¶ 4). Notably, Kelly does not contend that he tried to enter one of the units but was unable to do so due to his handicap. The present record does not contain a single allegation by an EPVA member that he has even been to The Meadows much less that one of the units was made unavailable to him due to his handicap. *See* 42 U.S.C. § 3604(f)(1). Thus, the EPVA has failed to show that any one of its members has been adversely affected in any way by the discriminatory conduct of the defendants. As such, the EPVA has not asserted sufficient allegations of injury in fact to confer standing on the organization in a representative capacity. *Hunt,* 432 U.S. at 334, 97 S.Ct. at 2441; *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211–12. Accordingly, the defendants' motion to dismiss the Complaint with regard to the EPVA is granted.

Nevertheless, leave to amend is usually granted quite freely. *See Jones v. New York State Div. of Military and Naval Affairs,* 166 F.3d 45, 50 (2d Cir.1999) (citing *Hemphill v. Schott,* 141 F.3d 412, 420 [2d Cir.1998]). Thus, the EPVA may file an amended complaint to properly allege injury to any of its members. If the EPVA chooses to file an amended complaint, it must do so within thirty days of the date of this order.

With regard to the standing of LIHS, an organization has standing to sue in its own right if, like an individual, it alleges "such

a personal stake" in the outcome of the controversy that federal-court jurisdiction is warranted. *See Havens,* 455 U.S. at 378–79, 102 S.Ct. at 1124; *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 904–05 (2d Cir.1993). Thus, like an individual, an "organization must show actual or threatened injury in fact that is 'fairly traceable to the illegal action and likely to be redressed by a favorable court decision.'" *Ragin,* 6 F.3d at 904 (quoting *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27 (D.C.Cir.), *cert. denied,* 498 U.S. 980, 111 S.Ct. 508, 509, 112 L.Ed.2d 521 (1990)). In *Havens,* the Supreme Court held that a housing organization had claimed an injury sufficient to confer standing where the organization alleged that its financial resources had been· diverted from its counseling and referral services to investigating and counteracting the defendants' unlawful conduct. *See Havens,* 455 U.S. at 378–79, 102 S.Ct. at 1124–25. In particular, the Court found that the following claims of injury established a perceptible impairment of the organization's activities:

> "Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory practices."

*Havens,* 455 U.S. at 379, 102 S.Ct. at 1124 (quoting the Complaint). The Court also distinguished the housing organization's concrete and demonstrable injury from insufficient allegations of injury such as a "setback to the organization's abstract social interests." *Id.* (citing *Sierra Club v. Morton,* 405 U.S. at 739, 92 S.Ct. at 1368); *see Ragin,* 6 F.3d at 905 (" '[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. Ill.'" (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26,·40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976))).

The Second Circuit has seemingly taken a broad view of *Havens.* *See Brown v. Stone,* 66· F.Supp.2d· 412, 426 (E.D.N.Y. 1999). In *Ragin v. Macklowe,* the Court of Appeals found that an organization was entitled to standing where its deputy director . testified about the organization's mission, the time and resources she and her coworkers spent investigation the defendants' unlawful activity, and how it prevented them from devoting their time and energy from other matters. *See Ragin,* 6 F.3d at 905. The Court held that the deputy director's "testimony demonstrated that the [organization] was forced to 'devote significant resources to identify and ` counteract' the defendants' advertising practices and did so the to the detriment of their 'efforts to [obtain] equal access to housing through counseling and other. referral services.'" *Ragin,* 6 F.3d at 905 (quoting *Havens,* 455 U.S. at 379, 102 S.Ct. at 1124).

■ Applying these standards to the facts of this case, the Court finds that LIHS has alleged sufficient injury to confer standing. LIHS is a housing advocacy and enforcement agency whose primary objectives are "to promote racial and economic integration, to reduce and eliminate housing discrimination, to promote equal housing opportunities, and to promote the availability of affordable and accessible housing" (Complaint ¶ 7). To this end, LIHS spends much of its resources and its employees devote much. of their time to counseling clients on a variety of housing issues ·(*see* Santantonio affidavit ¶ 23). Santantonio's affidavit alleges that LIHS's investigation of The Meadows "resulted in a significant diversion of its resources [from its] primary mission as an enforcement, advocacy and counseling agency" (Santantonio affidavit ¶¶ 23, 25).

Santantonio provides a lengthy description of her personal involvement in LIHS's three-year investigation of The Meadows allegedly illegal conduct. She describes the phone testing she performed after re-

ceiving Ponticello's complaints about the accessibility problems at The Meadows. She also explains the steps she took to help Pfennig obtain a parking spot closer to his unit. Santantonio also states that she had meetings and conversations with individuals at NSLS, the U.S. Attorney's Office, and EPVA regarding their investigations of complaints regarding the accessibility of The Meadows. Furthermore, Santantonio details her review of the floor plans on file with the Town of Hempstead as well as her multiple visits to The Meadows to examine the accessibility of the development and to measure its doorways and hallways.

Santantonio's affidavit establishes that steps she took in identifying and counteracting the defendants' illegal activity were similar to those taken by the deputy director in *Ragin.* In addition, like the deputy director in *Ragin,* Santantonio's affidavit demonstrates that LIHS was forced to " 'devote significant resources' " to investigating the defendants' inaccessible construction of The Meadows to the detriment of their "primary mission as an enforcement, advocacy and counseling agency" (Santantonio affidavit ¶¶ 23, 25). *See Ragin,* 6 F.3d at 905 (quoting *Havens,* 455 U.S. at 379, 102 S.Ct. at 1124). Notably, the fact that some LIHS employees may have spent all of their time devoted to litigating this action "does not deprive the organization of standing to sue in federal court." *Id.* Under *Havens* and *Ragin,* LIHS has alleged an "actual or threatened injury in fact that is 'fairly traceable to the illegal action and likely to be redressed by a favorable court decision.' " *Id.* at 904 (quoting *Spann,* 899 F.2d at 27). As such, the Court finds that LIHS has standing to sue the defendants as an organization in its own right.

**B. Statute of Limitations**

Defendant Simplex moves to dismiss the complaint asserting that the statute of limitations to bring an action under the FHA has run. Simplex contends that the plaintiffs became aware of the alleged FHA violations in March 1998, at the latest. Thus, Simplex concludes, when the plaintiffs filed the complaint in April 2000, the two-year statute of limitations had expired. The statute of limitations issue will be addressed only as it applies to LIHS's claims, because the Court has dismissed EPVA's portion of the complaint.

The FHA requires that a suit be filed within two years "after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). In *Havens,* the Supreme Court recognized the applicability of the "continuing violation" doctrine to the FHA. *See Havens,* 455 U.S. at 380–81, 102 S.Ct. at 1125 (explaining difference between the plaintiff who challenges one incident of unlawful conduct and the plaintiff who challenges an unlawful practice, and holding that the latter is continuous and may toll the period of limitations). "A continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted ... to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694 (2d Cir.1994). Thus, where a plaintiff's claim is based on a an ongoing policy as opposed to a discrete incident, a continuing wrong is present. *See Association Against Discrimination v. City of Bridgeport,* 647 F.2d 256, 274–75 (2d Cir. 1981).

LIHS became aware of the defendants' allegedly discriminatory housing practice on or about November 13, 1997, and filed the complaint on May 2, 2000. LIHS claims that during the intervening three-year period, the defendants discriminated against people with handicap, because throughout that period, The Meadows was unavailable to wheelchair users. In particular, LIHS contends that from November 13, 1997, through May 2, 2000, the units at The Meadows did not have ramps, sufficiently wide doorways and hallways, and

accessible light switches and environmental controls.

The challenged discriminatory housing practice is clearly a continuing violation. LIHS does not complain of a discrete violation of the FHA, but instead describes an unlawful practice that began on November 17, 1993, and has continued to the present day. As such, LIHS alleges a continuing violation which, therefore, is timely made. *See Havens,* 455 U.S. at 380–81, 102 S.Ct. at 1125; *Association Against Discrimination,* 647 F.2d at 274–75, *see also Cornwell,* 23 F.3d at 694; *United States v. Yonkers Board of Ed.,* 992 F.Supp. 672, 675 (S.D.N.Y.1998) ("In a situation of ongoing wrong, it is as if the continuing policy of discrimination or violation repeatedly triggers and retriggers the statute of limitations clock."). Accordingly, Simplex's motion to dismiss based on the statute of limitations is denied.

### III.  *CONCLUSION*

Having reviewed the submissions of the parties, it is hereby

**ORDERED,** that the defendants' motion to dismiss is GRANTED, and the complaint of EPVA is dismissed, and it is further

**ORDERED,** that the defendants' motion to dismiss the complaint of LIHS is **DENIED,** and it is further

**ORDERED,** that Simplex's motion to dismiss the complaint is DENIED, and it is further

**ORDERED,** that if desired, plaintiffs EPVA shall serve an amended complaint, within thirty days of the date of this order, and in any event, no later than April 10, 2001, and it is further

**ORDERED,** that the parties are directed to report to Magistrate Judge Arlene R. Lindsay for a discovery schedule.

**SO ORDERED.**