853 A.2d 334 (2004)
371 N.J.Super. 409
ALLIANCE FOR DISABLED IN ACTION, INC., a New Jersey Not-for-Profit Corporation, on its own behalf and on behalf of the Class, Plaintiff-Appellant,
v.
RENAISSANCE ENTERPRISES, INC., A New Jersey Corporation; Renaissance Terrace, Inc., a New Jersey Corporation; the Construction Official of the Township of North Brunswick; Renaissance Village I, A Condominium, a New Jersey Not-for-Profit Corporation, The Renaissance at North Brunswick Master Association, a New Jersey Not-for-Profit Corporation, Defendants-Respondents, and
Salkin Group, Inc., Defendant.
Superior Court of New Jersey, Appellate Division.
Argued February 2, 2004.
Decided July 27, 2004.
*336 David J. Popiel, South Orange, argued the cause for appellant (Community Health Law Project, attorney; Mr. Popiel, on the brief).
John F. Gillick argued the cause for respondent North Brunswick Construction Official (Lynch Martin, attorneys; Mr. Gillick, on the brief).
Carol Matula argued the cause for respondent Renaissance Enterprises, Inc. (Haber & Silver, attorneys; Sherry L. Silver, of counsel and on the brief; Ms. Matula, on the brief).
*337 Respondent Renaissance Village I, A Condominium, relies on the brief submitted by respondent Renaissance Enterprises, Inc.
Respondent The Renaissance at North Master Association did not participate in this appeal.
Before Judges WEFING, COLLESTER and FUENTES.
The opinion of the court was delivered by
WEFING, J.A.D.
Plaintiff appeals from trial court orders granting summary judgment to defendants. After reviewing the record in light of the contentions advanced on appeal, we affirm in part and reverse in part and remand for further proceedings.
This appeal is companion to Alliance for Disabled in Action, Inc., v. Continental Properties, Docket No. A-465-02, 371 N.J.Super. 398, 853 A.2d 328. Both appeals were argued before us back-to-back; we issue our opinions simultaneously.

I
Plaintiff Alliance for Disabled in Action, Inc., ("ADA"), is a private, non-profit membership organization. In its complaint in this matter, it describes itself as seeking "to advance the rights and wellbeing of persons with disabilities generally, including those who require that buildings be accessible to persons with physical disabilities." Defendants Renaissance Enterprises, Inc. and Renaissance Terrace, Inc. ("Renaissance") are the developer of a large residential condominium project in North Brunswick known as Renaissance Village ("Village"). Defendant Renaissance Village I, a Condominium ("association") is the condominium association that owns and controls the project's common elements. Defendant Renaissance at North Brunswick Master Association, ("master association"), owns and controls the pool, recreation building and associated recreational facilities in the Village. Defendant Salkin Group, Inc., was the architect for this project. It has never been served and has not participated in this litigation. The remaining defendant is North Brunswick's Construction Official.
The project is a large one. There are fifteen separate buildings in the Village, each of which contains twenty-two units. The majority of these units are multi-level units and the buildings within the Village are not serviced by elevators. In addition to these multi-level units, however, there are 135 ground-floor units without basements. Each of these units, referred to as "Sussex" units, has its own separate ground-level entrance.
In this litigation, plaintiff contended that these Sussex units, as well as portions of the Village's common elements and recreational facilities, did not comply with New Jersey's Barrier Free Subcode, N.J.A.C. 5:23-7.1 to -7.31, ("subcode"). Plaintiff initially sought to have this matter proceed as a class action. It does not challenge on appeal the trial court's denial of that motion.
The trial court also ruled by way of a series of summary judgment motions that plaintiff's claims were barred by the statute of limitations, that the project was exempt from the standards of the subcode, and that the construction code official was entitled to summary judgment in any event. Plaintiff has appealed from those rulings. We are satisfied the trial court erred in holding that plaintiff's claims are barred by the statute of limitations and in holding that the project was exempt from the requirements of the subcode and we reverse those rulings. The trial court, however, properly granted summary judgment *338 to the construction code official and we affirm that determination.
Plaintiff filed its initial complaint on October 20, 1998. It alleged that the design and construction of the project was not in conformance with the subcode. In its complaint it included allegations that the doors to the bedrooms, bathrooms and walk-in closets in the Sussex units were not sufficiently wide to accommodate wheelchair access, that cabinetry beneath the bathroom sink was not designed to be removable, that grab bars could not be installed alongside the toilets and that the kitchen tops were not mounted at the proper fixed height or designed to be adjustable.
Plaintiff alleged that Renaissance's involvement in the design and construction of these units and the actions of the Construction Official in issuing the construction permits were acts of discrimination under the Law Against Discrimination, N.J.S.A. 10:5-1 to -49 ("LAD"). N.J.S.A. 10:5-12.4 declares that a "failure to design and construct any multi-family dwelling of four or more units in accordance with barrier free standards... [is] unlawful discrimination." Plaintiff subsequently amended its complaint to allege related violations in connection with the design and construction of certain of the common elements and the swimming pool and recreation building.
In November 2001, plaintiff voluntarily dismissed its claims against the association and master association. The trial court entered final judgment in October 2002, in which it awarded plaintiff a counsel fee of $26,342.39.

II
We turn first to the question whether plaintiff's complaint was untimely under the statute of limitations. The trial court made no explicit determination whether plaintiff's claims are subject to a six-year period of limitations or a two-year period of limitations because it was satisfied that plaintiff's claims were untimely no matter which period was utilized.

A
The record before us does not disclose when planning began for this development and how long that planning process took. Defendant Renaissance, however, received approval on October 9, 1992, for the prototype plans for the Sussex units. Because these were prototype plans, Renaissance did not have to resubmit new plans each time a Sussex unit was constructed. Based upon that approval, Renaissance received construction permits for these Sussex units over a four-year period, from January 1993 through January 1997. A model Sussex unit was open for inspection in 1993 and sales commenced that same year. As of December 2000, only one Sussex unit remained unsold.
According to the trial court, plaintiff's LAD-based claims accrued, and the period of limitations began to run, when plaintiff knew or should have known about the alleged violations of the standards for handicapped accessibility in the Village. The trial court, relying on the fact that plaintiff is an advocacy organization for the rights of the handicapped, concluded that it knew or should have known of these alleged violations on October 19, 1992, when the construction code official approved the prototype plans and no later than September or October 1993 when the model Sussex unit was open for inspection by the public.
We are satisfied the trial court erred in this regard. The trial court cited no authority at all for the proposition that plaintiff should be charged with notice of this project and our research has uncovered *339 none. Nor can we perceive any basis in either policy or logic to adopt such an approach. Plaintiff is a private organization that advocates on behalf of the rights of the disabled. It has no responsibility to monitor design and construction activities in the hundreds of municipalities throughout the State of New Jersey.
Further, we consider the selection of the date of approval of the prototype plans or the date the model unit was open for inspection to conflict with the language of N.J.S.A. 10:5-12.4 which declares it to be unlawful discrimination "to design and construct" (emphasis added) a non-exempt building that does not comply with the subcode. Approval of the prototype plans should not, in our judgment, mark the start of the period of limitations for nothing had yet been constructed at that point and it is the actual construction which triggers liability under the statute.
Similarly, we also reject the alternate date selected by the trial court, the opening of the model unit. The construction of that unit would not start the period of limitations for those Sussex units not yet built.
In our judgment, the appropriate date to start the period of limitations is the date construction was completed on these units, that is, the date upon which a certificate of occupancy was issued. The record before us does not indicate when certificates of occupancy were issued for each of the Sussex units but it does indicate that certificates of occupancy were issued for at least some of the Sussex units within two years of the filing of plaintiff's complaint.[1]

B
The more difficult question is whether defendants were entitled to summary judgment for those Sussex units for which certificates of occupancy were issued more than two years prior to the filing of this complaint or whether the continuation of construction activity deprives defendants of the protection of the limitations period. Plaintiff contends that we should invoke either the continuing violation doctrine or the discovery doctrine to permit its claims relating to the entire Village to proceed.
"For causes of action arising under anti-discrimination laws ... a judicially created doctrine known as the continuing violation theory has developed as an equitable exception to the statute of limitations." Bolinger v. Bell Atl., 330 N.J.Super. 300, 306, 749 A.2d 857 (App.Div.), certif. denied, 165 N.J. 491, 758 A.2d 650 (2000). In Bolinger, we set forth the elements of the continuing violation doctrine:
To establish a continuing violation based on a series of discriminatory acts, a plaintiff must show that
(1) at least one allegedly discriminatory act occurred within the filing period and (2) the discrimination is "more than the occurrence of isolated or sporadic acts of intentional discrimination" and is instead a continuing pattern of discrimination.
Upon satisfying these criteria, a plaintiff may recover for damages incurred as a result of the entire continuing violation. In evaluating whether alleged incidents of discrimination constitute a continuing violation, a court should consider three factors:
(i) subject matter  whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence  whether the nature of the *340 violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.
[Id. at 307, 749 A.2d 857 (citations omitted).]
We recently explained the underpinnings of the continuing violation theory in LAD-based claims.
An actionable claim under LAD based upon a hostile work environment frequently arises out of repeated incidents that take place over time and by their cumulative effect make it unreasonable and unhealthy for the plaintiff to remain in that work environment.
[Caggiano v. Fontoura, 354 N.J.Super. 111, 126, 804 A.2d 1193, (App.Div.2002).]
The United States Supreme Court applied the continuing violation doctrine in Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L. Ed.2d 106 (2002). The question before the Court was whether the suit of Abner J. Morgan, Jr., a black male, who alleged discrimination and retaliation on the part of his employer, was timely filed under Title VII of the 1964 Civil Rights Act. 42 U.S.C. 2000e-5(e)(1). In his complaint, Morgan alleged both discrete discriminatory acts and the existence of a hostile work environment, and the Court in its opinion distinguished between the two. Those discrete discriminatory acts that occurred outside the period of limitations were barred, the Court concluded. It recognized, however, that a claim of a hostile work environment "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Morgan, supra, 536 U.S. at 115, 122 S.Ct. at 2073, 153 L. Ed.2d at 123. So long, the Court concluded, as one "act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id., 536 U.S. at 117, 122 S.Ct. at 2074, 153 L. Ed.2d at 124.
Shortly after Morgan, our Supreme Court applied the continuing violation doctrine to an employment discrimination matter in which plaintiff presented a hostile environment claim. Shepherd v. Hunterdon Developmental Center, 174 N.J. 1, 803 A.2d 611 (2002). In Shepherd, our Supreme Court also recognized the distinction between discrete discriminatory acts, such as terminations, failures to promote and refusals to hire, each of which are separate actionable wrongs, and a claim of hostile environment, which involves "repeated conduct" that has a cumulative discriminatory effect over a period of time. Id. at 19-21, 803 A.2d 611. The Court concluded that as to a claim of hostile environment, "plaintiffs' cause of action accrued on the date of the last act in the pattern or series of acts that comprise the continuing violation claim." Id. at 21-22, 803 A.2d 611.
Plaintiff, contending that the construction of these Sussex units constituted a "continual, cumulative pattern of tortious conduct," Bolinger, supra, 330 N.J.Super. at 306-07, 749 A.2d 857, urges application of the continuing violation theory. The trial court viewed the construction of each individual Sussex unit as a separate, discrete event and declined to invoke the continuing violation doctrine. We do not subscribe wholly to either view.
While there is no reported New Jersey opinion which has considered the continuing violation theory in the context of alleged discrimination in terms of accessibility for the handicapped, we can perceive no reason in logic or policy why the continuing violation doctrine could not be applicable *341 to a case involving such claimed discrimination. Several courts in other jurisdictions have employed the doctrine when analyzing a limitations defense. They have done so, however, utilizing different approaches and with different results. Plaintiff points to four federal courts which have analyzed the matter. Moseke v. Miller and Smith, Inc., 202 F.Supp.2d 492 (E.D.Va.2002); Eastern Paralyzed Veterans Ass'n, Inc. v. Lazarus-Burman Assocs., 133 F.Supp.2d 203 (E.D.N.Y.2001); Montana Fair Housing, Inc. v. American Capital Dev., Inc., 81 F.Supp.2d 1057 (D.Mont.1999); Baltimore Neighborhoods v. Rommel Builders, 40 F.Supp.2d 700 (D.Md.1999).
In Eastern Paralyzed Veterans Assoc. v. Lazarus-Burman Assoc., supra, defendants constructed a senior-citizen affordable housing complex. Plaintiffs were aware more than two years prior to filing suit that certain of the units did not comply with standards for handicapped-accessibility. Defendant moved for summary judgment based on the statute of limitations. The trial court denied defendant's motion, concluding that the presence of the offending features was a continuing violation and thus the statute of limitations had not expired. Id. at 213.
That approach was rejected in Moseke v. Miller and Smith, Inc., supra. That court distinguished between a continuing violation and the continuing effect of a prior violation. The court noted that to adopt such reasoning
eviscerates the statute of limitations with respect to design and construction and claims. If the mere existence of a ... non-compliant building is a continuing violation ... then there is no limitations period on a disability discrimination claim involving design and construction.
[Moseke, supra, 202 F.Supp.2d at 508.]
Plaintiff Moseke was required to use a motorized scooter due to her juvenile rheumatoid arthritis. Id. at 495. She sued defendant in November 2001 alleging that a complex it had developed did not comply with accessibility requirements for the handicapped both under federal and state law. Ibid. The apartment complex had been completed in 1995, six years prior to plaintiff's suit and defendant sought summary judgment on a variety of grounds, including the statute of limitations. Because no discriminatory act occurred within the period of limitations, the court declined to apply the continuing violations theory. The court rejected plaintiff's argument that the existence of the non-accessible features was a continuing violation. Rather, the court concluded, those features were a continuing effect of a prior violation.
Other courts confronted with a limitations defense to a claim of discrimination in terms of handicapped accessibility have turned to the particular language of the federal Fair Housing Act, under which the cases were brought. In MontanaFair Housing v. American Capital Development, supra, the court denied defendant's motion premised on limitations grounds, citing the provision in the federal statute under which suit shall be brought "no later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice ... whichever occurs last." Id. at 1063 (quoting 42 U.S.C. § 3613(a)(1)(a). Because the builder in that case had installed an entrance ramp to afford wheelchair access, within two years of suit, the claim was considered timely.
In both Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc., 250 F.Supp.2d 706 (W.D.Ky.2003), and Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc., supra, the courts, relying *342 on the same section cited by the Montana court, concluded that the period of limitations did not start to run until the sale of the last non-compliant unit.
Recently, the District Court for the District of Idaho declined to adopt the continuing violation doctrine in United States v. Taigen & Sons, Inc., 303 F.Supp.2d 1129 (D.Idaho 2003), a case alleging a failure to design and construct an apartment complex in accordance with handicapped accessibility requirements of the federal Fair Housing Act and the Americans with Disabilities Act. The Taigen court agreed with the Moseke court that there is a distinction between a continuing violation and the continuing effect of a prior violation. Id. at 1141.
The continuing violation theory has been referred to as "one of the most confusing theories in employment discrimination law." Thelma A. Crivens, The Continuing Violation Theory and Systemic Discrimination: In Search of a Judicial Standard for Timely Filing, 41 Vand. L.Rev. 1171, 1172 (1988). Although, as we have noted, we see no analytical reason not to apply the continuing violation theory to this matter, we do so with particular caution, so as not to engender further confusion and uncertainty.
In general, ... the [continuing violation] theory allows a court to impose a remedy not only for discrimination that has occurred within the statute of limitations period, but also for discriminatory acts that otherwise would be time-barred. In order to receive a remedy for discriminatory acts that occur after the limitations period has expired, the plaintiff first will have to prove that those acts were part of a pattern of discrimination that continued into the statute of limitations period.
[Crivens, supra, 41 Vand. L.Rev. at 1172-73.]
We consider it significant that in the two cases which had rejected the continuing violation theory in the context of a failure to meet handicapped accessibility requirements, Moseke, supra, and Taigen, supra, there was no discriminatory conduct, i.e., no construction, within the period of limitations. Here, however, such construction activity did take place within two years of the filing of the complaint. We are thus in fact dealing with a continuing violation, not a continuing effect of a `prior violation'.
Although New Jersey's LAD does not contain language comparable to that relied upon by the courts in Montana, Fair Housing and Baltimore Neighborhoods, supra, we think the approach of those courts, relying upon a determinable event to start the period of limitations, is sounder than that adopted in Eastern Veterans, supra, which treated the existence of a non-compliant unit as a continuing violation. We concur with the views expressed in Moseke, supra, and Taigen, supra, that there is a distinction between a continuing effect and a continuing violation and to treat them as synonymous is to disregard any period of limitations.
In our view, under the facts presented in the instant matter, there is no unfairness in invoking the continuous violation theory and computing the period of limitations from the issuance of the last certificate of occupancy. This project was built on a continuous basis, with no significant interruption in construction activity. The use of these prototype plans by defendant Renaissance was one of the factors which permitted this construction to proceed on that continuous basis. If Renaissance achieved a benefit by being able to complete this project in a relatively short time frame by using these prototype plans, it does not strike us as unfair to make it assume a corresponding burden.
*343 In addition, there is no contention that plaintiff was aware of subcode violations and yet purposely withheld filing suit until near completion of the project. Use of such a tactic might well call for a different analysis.
We recognize that it is not unheard of that a developer may, for financial reasons or otherwise, begin a project and put it aside for a number of years. Nor is it unusual for a developer to proceed in phases, with a significant period of interruption between phases. Those situations are not before us and we express no views on whether the same analysis would be required in such a context.

C
Our conclusion that plaintiff's action is timely under the continuous violation theory makes it unnecessary to deal with plaintiff's alternative argument, that the statute of limitations did not begin to run until plaintiff had actual knowledge of these violations. We recognize that the discovery rule carries with it the potential to expand the period of limitations well beyond that which we have permitted under our narrow formulation of a continuing violation. Prudence dictates we go no further than is required to decide the matter at hand. We consider it sufficient that we have already indicated that we reject the trial court's conclusion that plaintiff should be charged with constructive knowledge of these alleged violations, in light of its nature and purpose, as of the date the prototype plans were approved.

III
Plaintiff contends, again in the alternative, that it is entitled to a six-year statute of limitations because, in its view, certain of the operative facts occurred prior to the date of decision in Montells v. Haynes, 133 N.J. 282, 627 A.2d 654 (1993). We note the argument for the sake of completeness, although, as with the discovery rule, it is not necessary to our conclusion because we are satisfied that plaintiff's action is timely under the continuous violation rule.
The New Jersey LAD does not contain a specific period of limitations within which actions seeking relief under the statute must be commenced. In Montells v. Haynes, 133 N.J. 282, 291-92, 627 A.2d 654 (1993), the Supreme Court resolved that issue by holding that a two-year period of limitations should be applied to LAD-based litigation. It also ruled that its holding in that regard should be apply prospectively, that is Montells"applies only to cases in which the operative facts arise after the date of decision", July 27, 1993. Id. at 298, 627 A.2d 654.
After its decision in Montells, supra, the Court decided Ali v. Rutgers, 166 N.J. 280, 765 A.2d 714 (2000), in which it distinguished between the accrual of a cause of action and the occurrence of "operative facts." It is the latter, the Court said, which is of significance in determining whether an LAD litigant is subject to a two-year limitations period or entitled to the benefit of the six-year period.
Plaintiff alleges that, in this case, "operative facts,", i.e., the planning and design of the Sussex units, took place prior to issuance of the Montells decision and thus that it is entitled to invoke the six-year period of limitations. While we recognize the distinction crafted by the Court in Ali, supra, we are satisfied that it is not of significance in this matter. We pointed out earlier in this opinion our reasons for selecting the date the certificate of occupancy was issued as the triggering date for limitations purposes. Those same reasons impel us to the conclusion that issuance of the certificate of occupancy *344 should be deemed the "operative fact" for limitations purposes. If, as we have said, design without construction would not trigger liability under the statute, such design and planning should not be deemed an operative fact.
Plaintiff has not established that certificates of occupancy were issued for any of these buildings prior to the Montells decision. According to the record before us, at most, such certificates could only have been issued for two of the fifteen buildings for only two building permits were issued prior to Montells, one in January 1993 and one on June 30, 1993. Thus, it would be only in connection with those two buildings, in any event, that plaintiff could claim a six-year period of limitations. In our judgment, it would not advance any substantive interests in the context of this matter to hold that defendant Renaissance was subject to a six-year statute of limitations in connection with those two buildings and plaintiff subject to a two-year period of limitations for the remaining thirteen buildings. We have earlier indicated that this complex was developed essentially on a continuous basis. To apply a different limitations period to two buildings would not further any legitimate objectives. Plaintiff's action is subject to the two-year statute of limitations enunciated in Montells, supra.

IV
The trial court also concluded that the manner in which Renaissance was constructed exempted it from the handicapped accessibility requirements. We are satisfied the trial court erred in this regard.
The court reached this conclusion based upon our decision in D.I.A.L. v. Clifton Const. App. Bd., 218 N.J.Super. 74, 526 A.2d 1125 (App.Div.1987). In that case, relying upon the then-existing N.J.A.C. 17:19A-1.2(a)(1), we concluded that a condominium project under development was exempt from the subcode requirements. The governing regulation at the time stated:
(a) These regulations apply to the construction or remodeling of all buildings, structures, and facilities used by the general public with the following exceptions:
1. One to four family residences: For the purpose of these regulations a residence is defined as a self-contained unit independently constructed or separated from similar units by party walls, fire walls, or fire separation walls.
The buildings in question in D.I.A.L. had ten residential units, each of which were separated by horizontal and vertical fire separation walls. Based upon that construction, we concluded that the project was exempt.
The trial court here adopted that approach and concluded that the circumstance that the Sussex units were separated from other units by restricted access vertical walls resulted in these fifteen buildings being divided into smaller, individual residences, and thus exempt from the subcode. The trial court did not take into account, however, that the regulations have been modified since our decision in D.I.A.L., supra.
When the prototype plan for Renaissance's Sussex unit was approved in 1992, the operative regulation, N.J.A.C. 5:23-7.3(a)(1), provided for the following exemption from the subcode:
Buildings or projects of Use Group R-2 or R-3 with three or fewer dwelling units, having common entrances or separate entrances directly from the exterior, whether for rental or arranged for sale shall be exempt.
This revised regulation omits any reference to vertical separation walls as a factor *345 to consider in determining whether a structure is subject to the subcode or exempt from it.
The original regulation with which we dealt in D.I.A.L. was promulgated by the State Treasurer. Subsequently, the Department of Community Affairs assumed responsibility for such matters and the Department promulgated the revised regulation to which we have referred. We consider the deletion of the reference to fire separation walls and the inclusion of apparently broader language concerning entrances to dwelling units to indicate that the Department intended to eliminate such walls as a factor in determining whether the exemption is applicable in a particular case. N.J.A.C. 5:23-7.3(a)(1) does not provide a basis to artificially divide the twenty-two dwelling units in these fifteen buildings into smaller "residences" so as to fit within the exemption.
We disagree with Renaissance's assertion that the definition of one-to-four family residences which we applied in D.I.A.L., supra, remained in effect through 1995. The historical note to N.J.A.C. 17:19A notes that the chapter expired on February 1, 1984, pursuant to Executive Order 66.

V
We turn now to plaintiff's claim that the trial court erred when it granted summary judgment to North Brunswick's construction code official. As to this, we are satisfied the trial court was correct.
Pointing to the plaintiff's failure to present proof of discriminatory motive or intent on the part of the construction code official, the trial court dismissed plaintiff's claim against him. Plaintiff does not contend that it has such proof of discriminatory motive or intent; rather, it contends that it did not need to present such proof.
Plaintiff presents two reasons to support this assertion. First, it contends that its claim in this case was one of "disparate impact" and thus it had no obligation to establish motive or intent. This, however, is not a case of disparate impact.
Disparate impact theory comes into play when an allegedly discriminatory act is facially neutral and its discriminatory effect can only be gauged by examining its impact on various groups. Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 81, 389 A.2d 465 (1978). The alleged discriminatory conduct, here, however, is not facially neutral. Sidewalks with curbing that is high and doorways that cannot be navigated by a wheelchair are definite physical barriers to persons with certain physical handicaps.
In addition, plaintiff failed to present, through statistical or other means, that the elements of which it complained at Renaissance Village had a disparate discriminatory impact upon persons with particular physical or other disabilities. Esposito v. Tp. of Edison, 306 N.J.Super. 280, 289-91, 703 A.2d 674 (App.Div.1997), certif. denied, 156 N.J. 384, 718 A.2d 1212 (1998). Plaintiff's contention that it should be allowed to proceed against the Construction Official on a theory of disparate impact is unavailing.
Plaintiff's second contention is that the Construction Official can be found liable under LAD for aiding and abetting the discriminatory conduct of defendant Renaissance. Research has not disclosed a reported New Jersey case in which an individual has been liable under the LAD as an aider or abettor. In Shepherd v. Hunterdon Developmental Ctr., 336 N.J.Super. 395, 424-26, 765 A.2d 217, (App.Div.2001), aff'd and rev'd on other grds, 174 N.J. 1, 803 A.2d 611 (2002), Judge LeFelt carefully analyzed the various *346 interpretations ascribed to the terms "aiding and abetting" within the context of an LAD-based claim. He noted that to aid or abet, "the individual must willfully and knowingly associate himself or herself with the unlawful act, and seek to help make the act succeed. The defendant must share the same intent as the one who actually committed the offense." Id. at 424, 803 A.2d 611.
It is impossible to infer from the record here that the Construction Official willfully and knowingly approved these plans, intending to further the construction of housing that did not comply with the subcode. The Construction Official may have been less than diligent in the manner in which he fulfilled his job responsibilities. Lack of diligence, however, is not enough to transform him into an aider and abettor and subject to liability under LAD.

VI
Plaintiff's final point on appeal is that it should be permitted to seek monetary damages in the event that it is not feasible to bring this complex into compliance with the subcode. In its pleadings, plaintiff only sought damages as compensation for the class. As we noted at the outset, plaintiff does not challenge the trial court's denial of class certification. The trial court never ruled on this issue and, in light of the remand we have directed, we decline to exercise our original jurisdiction to consider it. Plaintiff may file an appropriate motion in connection with the proceedings on remand. We express no opinion on how such a motion should be decided because the matter may prove to be entirely theoretical.
We add a few brief comments to address the concerns expressed by our colleague in his partial dissent. Judge Fuentes has eloquently stated the philosophy and goals behind New Jersey's commitment to end discrimination against the handicapped. We have no disagreement in that regard.
We are satisfied, however, that even under the principles articulated in Failla v. City of Passaic, 146 F.3d 149 (3rd Cir.1998), and Hurley v. Atlantic City Police Dep't., 174 F.3d 95 (3rd Cir.1999), the record presented here is simply insufficient to support a judgment of liability against the Construction Official for aiding and abetting Renaissance in discriminating against the handicapped. While plaintiff makes general arguments concerning the Construction Official's knowledge of the subcode and his involvement in the construction process through the approval of plans and the granting of building permits and certificates of occupancy and our colleague draws certain conclusions, the fact remains that plaintiff presented no proof that the Construction Official knowingly assisted or encouraged Renaissance in building structures that did not comply with the Subcode. Failure to perform job responsibilities is not the equivalent of aiding and abetting, absent proof of knowledge or intent.
The orders under review are affirmed in part and reversed in part and the matter is remanded to the trial court for further proceedings in accordance with this opinion.
FUENTES, J.A.D., concurring in part, dissenting in part.
I concur with the majority as to Points I through IV. I disagree as to Point V and therefore dissent on this issue. The evidence presented here, when viewed in the light most favorable to plaintiff, provides a rational basis from which a trier of fact can conclude that the construction official aided and abetted defendant in violating the barrier-free design standards for residential buildings found in N.J.A.C. 5:23-7.1 to -7.31. By so doing, the construction *347 official is liable to the plaintiff under N.J.S.A. 10:5-12e and N.J.S.A. 10:5-12.4.
The majority concludes that the construction official cannot be held liable as a matter of law because,
[i]t is impossible to infer from the record here that the Construction Official willfully and knowingly approved these plans, intending to further the construction of housing that did not comply with the subcode. The Construction Official may have been less than diligent in the manner in which he fulfilled his job responsibilities. Lack of diligence, however, is not enough to transform him into an aider and abettor and subject to liability under LAD.
[Alliance for Disabled in Action, Inc. v. Renaissance Enters., Inc., 371 N.J.Super. 409, 428-29, 853 A.2d at 334, 346 (App.Div.2004).]
I reject this standard for assessing aiding and abetting liability because it runs counter to the express public policy goals of the Law Against Discrimination (LAD). N.J.S.A. 10:5-3; Cedeno v. Montclair State Univ., 163 N.J. 473, 478, 750 A.2d 73 (2000); Andersen v. Exxon Co. U.S.A., 89 N.J. 483, 495, 446 A.2d 486 (1982); Fraser v. Robin Dee Day Camp, 44 N.J. 480, 486, 210 A.2d 208 (1965); Franek v. Tomahawk Lake Resort, 333 N.J.Super. 206, 216, 754 A.2d 1237 (App.Div.2000).
I would adopt the aiding and abetting standards articulated by the Third Circuit Court of Appeals in Failla v. City of Passaic, 146 F.3d 149 (3rd Cir.1998) and Hurley v. Atlantic City Police Dep't, 174 F.3d 95 (3rd. Cir.1999), as contained in the Restatement (Second) of Torts, § 876(b) (1977). Under the Failla/Hurley test, a party incurs liability if he or she knows that defendant's conduct constitutes a violation of the LAD and gives substantial assistance or encouragement in bringing about a violation.
Here, the construction official is charged, as a matter of law, with knowing the legal requirements of the Barrier Free Subcode. Indeed, the office of the construction official is charged with enforcement of the Barrier Free Subcode. N.J.A.C. 5:23-7.14. The majority characterizes the construction official's derelictions here as a mere lack of diligence. The evidence reveals a great deal more than that. This massive residential complex was designed and constructed in total defiance of the architectural accessibility standards mandated by the Barrier Free Subcode. Such wholesale violation of the law could not have taken place without the construction official's direct complicity, tacit approval or utter disregard for his legal responsibilities. No matter what the evidence ultimately establishes, a rational jury, applying the Failla/Hurley test, can find that the construction official aided and abetted the developer in constructing a residential community where our State's handicapped citizens need not apply.
The LAD represents our State's commitment to a discrimination-free society. As those who have experienced the pangs of exclusion have come forward seeking justice, our understanding of what constitutes invidious discrimination has evolved. Although the historical evidence of discrimination is undeniable,[2] in the minds of most Americans, the handicapped are relatively recent arrivals to the struggle for equal rights. The Americans With Disabilities *348 Act (ADA) was adopted by Congress in 1990. 42 U.S.C.A. §§ 12101-12213. However, New Jersey's commitment to eradicating discrimination against the handicapped predated the passage of the ADA by forty-five years.
All of the provisions of the act to which this act is a supplement shall be construed to prohibit any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment. It shall be unlawful discrimination under the "Law Against Discrimination," P.L.1945, c. 169 (C.10:5-1 et seq.) to discriminate against any buyer or renter because of the disability of a person residing in or intending to reside in a dwelling after it is sold, rented or made available or because of any person associated with the buyer or renter.
[N.J.S.A. 10:5-4.1]
This visionary piece of legislation was first adopted by the Legislature on April 16, 1945. The date of its passage was no historical accident. It coincided with the influx of great numbers of returning disabled veterans, who, after having successfully waged war on the forces of tyranny, were now demanding their rightful and equal place in the society that they sacrificed so much to protect.
The modern challenge is no less daunting. The Barrier Free Subcode is the substance giving meaning to the promise made by the Legislature. In its myriad of details, covering everything from curb-cuts to bathroom facilities, lies the freedom to function as an independent, fully-integrated member of society. Those entrusted with the enforcement of this Subcode are expected to do so not just diligently, but scrupulously, with the knowledge that the devil is indeed in the details. Here, the construction official's complete abdication of this responsibility warrants careful scrutiny by a jury of his peers.
I therefore respectfully dissent.
NOTES
[1] In Part II of our opinion, we address the question whether a two-or a six-year limitation period applies to plaintiff's complaint.
[2] The Legal Rights of Handicapped Persons, Cases, Materials, and Text (Robert L. Burgdorf, Jr. ed., 1980). See also 42 U.S.C.A. § 12101(a)(2), wherein Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem...."