904 A.2d 775 (2006)
387 N.J. Super. 469
STATE of New Jersey, DEPARTMENT OF TREASURY, DIVISION OF INVESTMENT, by Treasurer John E. McCORMAC, Plaintiff-Appellant,
v.
QWEST COMMUNICATIONS INTERNATIONAL, INC., Philip F. Anschutz; Joseph P. Nacchio; Robin R. Szeliga; Robert S. Woodruff; Stephen M. Jacobsen; Drake S. Tempest; Marc B. Weisberg; James A. Smith; Afshin Mohebbi; Lewis O. Wilks; Craig D. Slater, Defendants, and
Arthur Andersen, LLP, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued November 16, 2005.
Decided August 18, 2006.
*777 Todd S. Collins (Berger & Montague) of the Pennsylvania Bar, admitted pro hac vice, Philadelphia, PA, argued the cause for appellant (Sterns & Weinroth, Trenton and Merrill G. Davidoff, Michael C. Dell'Angelo, and Ellen T. Noteware (Berger & Montague) of the Pennsylvania Bar, admitted pro hac vice, attorneys, Philadelphia, PA; William J. Bigham, Trenton, on the brief).
William H. Trousdale and Elissa J. Preheim (Arnold & Porter) of the District of Columbia Bar, admitted pro hac vice, Washington, DC, argued the cause for respondent (Tompkins, McGuire, Wachenfeld & Barry, attorneys, Newark; Mr. Trousdale and Ms. Preheim, Scott B. Schreiber and John A. Freedman (Arnold & Porter) of the District of Columbia Bar, admitted pro hac vice, Washington, DC, of counsel and on the brief).
Before Judges STERN, GRALL and LIHOTZ.
The opinion of the court was delivered by
*778 LIHOTZ, J.T.C. (temporarily assigned).
Plaintiff, the State of New Jersey Department of Treasury (NJT), filed suit seeking damages for an alleged securities fraud against Qwest Communications International, Inc., certain individual corporate directors and officers of Qwest (individual defendants), and the former accountants and auditors for Qwest, Arthur Andersen, LLP (Andersen). Pursuant to our leave granted, NJT appeals the trial court's interlocutory order granting Andersen's motion to dismiss its complaint with prejudice for failure to state a claim. Additionally, appeals were filed by the individual defendants asserting unrelated relief. We consolidated the appeals for argument. After argument, the matters were deconsolidated by order dated November 18, 2005 and the appeals of the individual defendants were separately addressed. See State of NJ v. Qwest Communications Int., Inc., 387 N.J.Super. 487, 904 A.2d 786 (App. Div.2006).
In NJT's appeal, we review whether the trial court erred in granting Andersen's motion to dismiss NJT's amended complaint, relying on the New Jersey Accountant Liability Act, N.J.S.A. 2A:53A-25 (Act). We hold that it did, and reverse.
Our factual review starts with the pleadings. By complaint dated November 27, 2002, NJT sought damages for the fraudulent activities of Qwest, Andersen and the individual defendants, during the period of November 2000 through November 2001, which "caused Qwest's stock to trade at artificially inflated prices by employing improper accounting practices, and by issuing false and misleading statements about Qwest's business, revenues, and profits." More specifically, NJT asserts Andersen "participated in and blessed Qwest's illicit swap transactions and the improper accounting practices" designed "to inflate Qwest's reported revenues and earnings," and in turn its stock price, at a time when NJT purchased the stock through its Division of Investment.
The complaint alleges "one key component of the scheme" to artificially inflate Qwest's revenues and earnings, "involved Qwest's participation in `swap' transactions [of optical network capacity] . . . which had no legitimate economic purpose." In these "swap transactions" Qwest purportedly sold capacity on its optical telecommunications network to other carriers reporting the receipts as revenue, while simultaneously buying a nearly identical amount of capacity from other carriers and capitalizing that expense over time, rather than reporting it as a current operating cost. As a result, the reported corporate revenues swelled. In turn, Qwest's stock price rose. Upon discovery of the alleged fraudulent practices, Qwest acknowledged the erroneous revenue reporting, its stock price then plummeted, resulting in NJT's loss of tens of millions of dollars on its investment.
Andersen moved to dismiss those counts of the original complaint against it asserting the complaint failed to state a claim for relief. After a hearing, the trial court granted NJT leave to amend its complaint and cure the noted deficiencies.
NJT filed its amended complaint on October 17, 2003. The amended complaint charged that during the period April 1999 through December 2001, Andersen, both as the outside auditor for Qwest for the years 1999 to 2002, as well as a professional consultant to the corporation its subsidiaries and affiliates, "was deeply involved and complicit in the fraudulent conduct at issue in this case." NJT contends Andersen aided and abetted Qwest's fraud by intentionally advising Qwest on how to structure the illicit swap transactions and other accounting practices to artificially *779 inflate Qwest's revenues because Andersen "possessed unique and superior knowledge of Qwest's accounting and business practices, and was informed of the specific fraudulent actions used in various acquisition transactions, including [the] `swap agreements.'" In furtherance of the fraud, NJT maintains "Andersen participated in, knew of, and/or recklessly disregarded the facts and circumstances of the [fraudulent] acts" when issuing numerous public documents regarding Qwest's financial status and participated in Qwest's manipulation of the fraudulent public financial disclosures by advising the corporation on how to accomplish its fraud. The amended complaint also contains a new claim of civil conspiracy against all defendants.
The amended complaint includes details supporting the NJT's allegations regarding Andersen's role in aiding and abetting the alleged fraudulent scheme. NJT maintains its amended pleading identifies the specific fraudulent acts committed by Andersen evincing Andersen's actual knowledge of and participation in the fraudulent accounting scheme, which NJT asserts Andersen purposefully designed for Qwest with the sole objective of inflating earnings without reporting corresponding expenses, in order to inflate the corporate balance sheet.
The amended complaint contains allegations of Andersen's conduct in paragraphs 411 to 442. NJT's arguments can be summarized as follows:
Advising Qwest of the manner to structure the illicit swap transactions and related accounting activities designed to fraudulently inflate Qwest's revenues and, correspondingly, the corporate share price for the period 1999 to 2002. Directing the actual implementation of the financial reporting of the scheme, then submitting its audit opinion for the company's fiscal year-end financial statements for 1999, 2000, and 2001, certifying the accuracy of the financial disclosures as a "neutral outside auditor."
Preparing a series of "White Papers" for Qwest's use itemizing a step-by-step plan for Qwest to immediately recognize revenue from the illicit swap transactions, notwithstanding accounting guidelines mandating a contrary reporting method of that revenue stream.
Providing accounting audit opinions, along with tax and audit advice, which were included in SEC filings and proxy statements, knowing the opinions failed to disclose the illicit swap transactions. Participating in Qwest's plan to manipulate corporate revenue by sanctioning the public release of the financial reports, which included the improper increased earnings, and failing to ensure that Qwest's public financial reports disclosed the sham transactions.
Communicating with Qwest's management, including the Board of Directors, through emails, Excel programs and other reports, which approved and assisted Qwest's in-house accounting staff to structure the fraudulent transactions.
Certifying Qwest's Form 10-K for calendar years 2000 and 2001 despite Andersen's knowledge that the reports contained fraudulent financial data and overstated revenues.
In further support of its position, NJT maintains that after discovery of the fraud, Qwest's management directly implicated Andersen. Afshin Mohebbi, a former Qwest CEO and President, testified on September 4, 2002, before the House of Representatives, that Andersen reviewed Qwest's swap transactions each quarter. Robin Szeliga, a former CFO and V.P. of Finance for Qwest and defendant in this action, testified that Andersen played a critical role in advising Qwest on financial reporting and accounting, worked closely *780 with Qwest's controller and technical accounting group, performed annual audits and quarterly pre-issuance reviews, and periodically made presentations to the audit committee of the board of directors. In a July 2002 press release Qwest reported that Andersen had full knowledge and approved of Qwest's method of accounting for the swap transactions and in an October 28, 2002 press release Qwest stated that with the guidance of Arthur Andersen, Qwest had improperly recognized and reported $1.48 billion of revenue from the swap transactions following the June 30, 2000 merger of Qwest and U.S. West, Inc.
NJT further asserts that throughout the period in question, Andersen received millions of dollars in fees, not only as Qwest's independent auditor, but also in payment for accounting services and advice in furtherance of the fraudulent reporting. Thus, Andersen's continued active participation in structuring and concealing the illegal fraudulent accounting activities was designed to continue Andersen's accounting and consulting fees.
Andersen filed a motion to dismiss the amended complaint, arguing the amended pleading "did not cure the deficiencies identified by th[e] Court last year. It essentially re-characterizes the same allegations of negligence [as fraud], and it fails to allege with particularity the facts regarding Arthur Andersen." Thus, Andersen argued plaintiff failed to state a claim upon which relief could be granted. A hearing on Andersen's motion to dismiss was held on June 28, 2004, at which time decision was reserved.
On December 3, 2004, the court granted Andersen's motion for judgment on the pleadings with prejudice pursuant to R. 4:6-2(e) and R. 4:5-8, dismissing the counts of NJT's complaint alleging aiding and abetting fraud and civil conspiracy against Andersen. Relying on the Supreme Court's decision in E. Dickerson & Son, Inc. v. Ernst & Young, 179 N.J. 500, 846 A.2d 1237 (2004), the trial court held that the complaint, as pled, failed to state a claim against Andersen cognizable under subsection b(2) of the Act. N.J.S.A. 2A:53A-25b(2).
On appeal, NJT argues the amended complaint sufficiently states a claim for aiding and abetting fraud and civil conspiracy, and the trial court incorrectly interpreted the Act in a way that "undermines the legislative public policy objectives . . . by encouraging accountants to coach their clients in the mechanics of accounting fraud and assist them in defrauding investors." On that ground NJT asks us to reverse. Andersen contends that the trial court correctly dismissed the claims against it because "the allegations in the amended complaint are palpably insufficient to support claims for aiding and abetting fraud and conspiracy to commit fraud," and support only claims based on negligence, which are barred by the Act.
When a motion challenging the legal sufficiency of a complaint is filed, plaintiff is entitled to a liberal interpretation and given the benefit of all favorable inferences that reasonably may be drawn. Stubaus v. Whitman, 339 N.J.Super. 38, 52, 770 A.2d 1222 (App.Div.2001) certif. denied, 171 N.J. 442, 794 A.2d 181 (2002); Burg v. State, 147 N.J.Super. 316, 319-20, 371 A.2d 308 (App.Div.), certif. denied, 75 N.J. 11, 379 A.2d 242 (1977). "Our inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint" after an in depth search "made with liberality," to discern whether a cause of action is found, even in "an obscure statement of claim." Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989); Rieder v. Dept. of Transp., 221 N.J.Super. 547, 552, 535 A.2d 512 (App.Div.1987).
*781 A motion to dismiss a complaint for failure to state a cause of action must be denied if the claim has been made out. Printing Mart-Morristown, supra, 116 N.J. at 746, 563 A.2d 31. The motion should be granted only in rare instances, ordinarily without prejudice. Id. at 772, 563 A.2d 31; Fazilat v. Feldstein, 180 N.J. 74, 78, 848 A.2d 761 (2004).
Andersen correctly points out that, the enactment of "N.J.S.A. 2A:53A-25 . . . provides greater protections for accountants by limiting their exposure to liability for damages for negligence to third parties." NCP Litigation Trust v. KPMG, LLP, 187 N.J. 353, 380, 901 A.2d 871 (2006). Thus, generally, the negligent performance of audit services for a client does not give rise to third-party liability.
In pertinent part, the Act provides:
b. Notwithstanding the provisions of any other law, no accountant shall be liable for damages for negligence arising out of and in the course of rendering any professional accounting service unless:
(1) The claimant against the accountant was the accountant's client; or
(2) The accountant:
(a) knew at the time of the engagement by the client, or agreed with the client after the time of the engagement, that the professional accounting service rendered to the client would be made available to the claimant, who was specifically identified to the accountant in connection with a specified transaction made by the claimant;
(b) knew that the claimant intended to rely upon the professional accounting service in connection with that specified transaction; and
(c) directly expressed to the claimant, by words or conduct, the accountant's understanding of the claimant's intended reliance on the professional accounting service . . . .
[N.J.S.A. 2A:53A-25b (emphasis added).]
The Act, however, exempts from its immunity provisions, negligence occurring where the accountant and the third party are in privity. Finderne Mgmt. Co. v. Barrett, 355 N.J.Super. 197, 205, 809 A.2d 857 (App.Div.2002), certif. denied, 177 N.J. 219, 827 A.2d 287 (2003), so that negligent conduct is actionable when the accountant knows the third party will rely upon his audit and the accountant agreed his work would be released to and relied upon by the third party.
The trial court found as dispositive the Supreme Court's recent ruling E. Dickerson & Son, Inc., supra, 179 N.J. at 503, 846 A.2d 1237. In E. Dickerson, however, plaintiffs did not allege Ernst and Young committed fraud, only that it had negligently failed to detect the fraud perpetrated by its client. Ibid. The Court affirmed the dismissal of the complaint against Ernst & Young under Rule 4:6-2(e), holding the complaint failed to allege a cause of action for negligence not barred by the Act. Id. at 502, 846 A.2d 1237.
Centering its review on whether NJT alleged an act of negligence against Andersen cognizable under the Act in this matter, the trial court found none and dismissed NJT's complaint. NJT concedes it has not satisfied the Act's exceptions as to a cause for negligence. NJT asserts, however, that its complaint sounds in fraud, which is not barred by the Act. We agree. The Act applies to actions for negligence. N.J.S.A. 2A:53A-25b. It does not shield accountants from intentional acts of fraud or from intentional acts which assist a client in committing a fraud or conspiratorial cooperation aimed at perpetration of a fraud. The plain language of the statute limits its provisions to *782 and precludes extension beyond negligence claims.
Andersen counters, as an alternate basis of relief, that aiding and abetting fraud is not a recognized cause of action in New Jersey and "[e]ven if a separate tort of aiding and abetting fraud exists in New Jersey, plaintiff failed to plead the necessary facts to establish aiding and abetting liability here."
We disagree with Andersen's contentions that there is no actionable tort of aiding and abetting fraud and find that aiding and abetting fraud is a cognizable civil cause of action under New Jersey law.
Generally, the combination, "to aid or abet," is used in criminal law. In that context, we have defined "aid" as meaning "to assist, support or supplement the efforts of another," and "abet" as meaning "to encourage, counsel, incite or instigate the commission of a crime." State v. Newell, 152 N.J.Super. 460, 469, 378 A.2d 47 (App.Div.1977). The terms have frequently been used with the same meaning in civil law contexts. See, e.g., Jaclyn, Inc. v. Edison Bros. Stores, Inc., 170 N.J.Super. 334, 368, 406 A.2d 474 (Law Div.1979); Schneider v. Hamilton Trust Co., 116 N.J.Eq. 55, 57, 172 A. 517 (Ch.1934), aff'd, 119 N.J.Eq. 93, 181 A. 42 (E. & A.1935)(parallel citations omitted).
[Baliko v. Stecker, 275 N.J.Super. 182, 191, 645 A.2d 1218 (App.Div.1994).]
Recognition of claims for aiding and abetting liability is found in cases where one party "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 29, 134 A.2d 761 (1957) (internal citations omitted). See also In re Integrity Ins. Co., 240 N.J.Super. 480, 502-03, 573 A.2d 928 (App.Div.1990)(company liquidator filed claims against the company's auditor alleging fraud, aiding and abetting fraud and other claims for the auditor's active participation in concealing the company's true economic condition by preparing and disseminating materially false financial statements); Franklin Med. Assocs. v. Newark Pub. Schs., 362 N.J.Super. 494, 510, 828 A.2d 966 (App.Div.2003) (person who bribes an agent of a principal has "aided and abetted" the agent in the breach of the agent's fiduciary duty of loyalty to the principal); Jaclyn, Inc. v. Edison Bros. Stores, Inc., 170 N.J.Super. 334, 368, 406 A.2d 474 (Law Div. 1979)(third party who knowingly aids and abets the agent of another in breach of the agent's fiduciary duty by tendering bribes to the agent, is liable to the principal for commissions paid).
Additionally, Federal courts have recognized a party may be held liable as an aider and abettor to a fraud where a plaintiff establishes the existence of an independent wrong, knowledge of that wrong and substantial assistance on the part of the aider or abettor to effectuate that wrong. Monsen v. Consol. Dressed Beef Co., 579 F.2d 793, 799 (3d Cir.), cert. denied, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); Landy v. Federal Deposit Ins. Corp., 486 F.2d 139, 162-63 (3d Cir.1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); Cammer v. Bloom, 711 F.Supp. 1264, 1296 (D.N.J.1989), appeal dismissed, 993 F.2d 875 (3rd Cir. 1993).
The Court in Tarr v. Ciasulli, 181 N.J. 70, 84-85, 853 A.2d 921 (2004), has interpreted the terms "aid" and "abet" as found in section 12e of the Law Against Discrimination Act (LAD), N.J.S.A. 10:5-12e.[1] *783 The Court held that § 876(b) of the Restatement (Second) of Torts (1979) provides the proper standard by which to define the terms "aid" or "abet" under the LAD because "the Restatement definition is consistent with the common usage of those terms" imposing concert liability on an individual if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Tarr, supra, 181 N.J. at 84, 853 A.2d 921.
Section 876(b) of the Restatement defines the tort of aiding and abetting as follows:
For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
(a) does a tortious act in concert with the other or pursuant to a common design with him, or
(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.
[Restatement, supra, 876(b).]
To impose liability the Restatement recites, "it is essential that the conduct of the actor be in itself tortious. One who innocently, rightfully and carefully does an act that has the effect of furthering the tortious conduct or cooperating in the tortious design of another is not for that reason subject to liability." Restatement, supra, 876(b) comment c. One court has suggested "inaction" could form the basis of aiding and abetting liability if it rose to the level of "providing substantial assistance or encouragement." Failla v. City of Passaic, 146 F.3d 149, 158 (3d Cir.1998) (court denied a defendant-supervisor's request for summary judgment finding he could be liable for aider and abettor liability if he knew the employer's failure to accommodate plaintiff was a breach of duty and his inaction assisted or encouraged the unlawful act).
However, the "mere common plan, design or even express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution. When both parties engage in the acts, each becomes subject to liability for the acts of the other." Restatement, supra, § 876(b) comment d. The standard is set above "mere knowledge or implementation." Herman v. Coastal Corp., 348 N.J.Super. 1, 26-27, 791 A.2d 238 (App.Div.), certif. denied, 174 N.J. 363, 807 A.2d 195 (2002); Shepherd v. Hunterdon Developmental Ctr., 336 N.J.Super. 395, 425, 765 A.2d 217 (App. Div.2001), aff'd in part, rev'd in part, 174 N.J. 1, 803 A.2d 611 (2002).
In Shepherd, we noted that to "aid or abet" under the LAD, "the individual must willfully and knowingly associate himself or herself with the unlawful act, and seek to help make the act succeed. The defendant must share the same intent as the one who actually committed the offense." Id. at 424, 765 A.2d 217. See also Alliance for Disabled in Action, Inc. v. Renaissance Enters., 371 N.J.Super. 409, 428, 853 A.2d 334 (App.Div.2004), aff'd, 185 N.J. 339, 886 A.2d 629 (2005).
*784 The Court has concluded that "in order to hold an employee liable as an aider or abettor [under the LAD] a plaintiff must show that
(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.'"
[Tarr, supra, 181 N.J. at 84, 853 A.2d 921 (citing Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 129 (3d Cir.1999), cert. denied, 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000)).]
Although this holding was made in the specific context of an LAD action, the general principles recited by the Court in adopting the Restatement's definition of aiding and abetting liability have broader application. We conclude that an action against a defendant for the tort of aiding and abetting is cognizable and, further, we find the elements as found by the Court in Tarr equally apply to a non-LAD tort action.
In the case at hand, NJT's complaint alleges Andersen aided and advised Qwest in performing its fraudulent reporting of earnings to inflate its stock price which caused NJT injury in the form of multi-million dollar losses when the fraud was disclosed. NJT alleges that Andersen was "generally aware of [its] role as part of the overall illegal [] activity" because it was an active participant and helped perpetrate the fraud; and Andersen "knowingly and substantially assist[ed]" Qwest with the creation and implementation of fraudulent accounting schemes to implement the fraud. Thus, NJT pled the fundamental requisites of aiding and abetting fraud.
A claim for aiding and abetting fraud also requires proof of the underlying tort, that is, the fraud committed by Qwest. Before a court can determine whether NJT's complaint withstands Andersen's motion under Rule 4:6-2(e), further examination of the alleged fraud action must be made, in compliance with Rule 4:5-8.
A complaint sounding in fraud, must on its face, satisfy the requirements of Rule 4:5-8. The heightened fraud pleading requirements set forth in the Rule provide the "particulars of the wrong, with dates and items if necessary, shall be stated insofar as practicable. Malice, intent, knowledge, and other condition of mind of a person may be alleged generally." R. 4:5-8(a). A court may dismiss a complaint alleging fraud if "the allegations do not set forth with specificity, nor do they constitute as pleaded, satisfaction of the elements of legal or equitable fraud." Levinson v. D'Alfonso & Stein, 320 N.J.Super. 312, 315, 727 A.2d 87 (App.Div. 1999); see also Kavky v. Herbalife Int'l of Am., 359 N.J.Super. 497, 509, 820 A.2d 677 (App.Div.2003); Rieder v. State Dep't of Transp., 221 N.J.Super. 547, 552, 535 A.2d 512 (App.Div.1987).
To state a claim for common law fraud, the following five elements must be pled:
(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.
[Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997) (citing Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 624-25, 432 A.2d 521 (1981)).]
*785 Paragraphs 411 to 442 of the Amended Complaint list facts, known before discovery, asserting Andersen's actions in presenting and propagating the fraudulent accounting reporting to advance Qwest's objective of increasing its stock value so an investor, like NJT, would increase its investment, to its detriment. The allegations are not merely that Andersen failed to detect Qwest's alleged fraudulent reporting of revenue and expenses, but that it actually facilitated the known fraud. NJT argues further discovery will provide the specificity of Andersen's acts. NJT's argument is tenable. Prior to discovery in any meaningful sense, NJT is hardly able to plead the precise culpable conduct of Andersen. Nevertheless, the complaint identifies numerous public statements containing false facts, allegedly known to be false by Andersen when reported. Finally, plaintiff alleges the elements of reliance and injury flowing from Andersen's allegedly fraudulent conduct.
Accepting the facts in the pleadings as true, giving NJT "the benefit of the most favorable inferences" when reviewing these allegations, NJT sufficiently states the requisites of the cause of action to defeat a motion to dismiss under R. 4:6-2(e). We reject Andersen's contention that NJT's claim of common-law fraud should be dismissed because NJT failed to plead the cause of action with particularity. R. 4:5-8(a). An indulgent reading of the allegations in the amended complaint satisfies us that NJT has stated the necessary elements.
Turning to the cause of action alleging a civil conspiracy between Qwest, its officers and Andersen, the necessary proofs must show
"a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." Morgan v. Union Cty. Bd. of Chosen Freeholders, 268 N.J.Super. 337, 364, 633 A.2d 985, (App. Div.1993), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994)(quoting Rotermund v. U.S. Steel Corp., 474 F.2d 1139, 1145 (8th Cir.1973)(internal quotations omitted)). "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir.1988). Most importantly, the "gist of the claim is not the unlawful agreement, `but the underlying wrong which, absent the conspiracy, would give a right of action.'" Morgan, supra, 268 N.J.Super. at 364, 633 A.2d 985 (quoting Bd. of Educ. v. Hoek, 38 N.J. 213, 238, 183 A.2d 633 (1962)); see also Weil v. Express Container Corp., 360 N.J.Super. 599, 614, 824 A.2d 174 (App.Div.), certif. denied, 177 N.J. 574, 832 A.2d 324 (2003).
[Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177-178, 876 A.2d 253 (2005)(parallel citations omitted).]
As discussed above, giving NJT the benefit of all inferences, we find these elements have been sufficiently pled to defeat Andersen's motion to dismiss.
We reverse the trial court's order and reinstate NJT's complaint.
Reversed.
NOTES
[1] The statute states, in pertinent part:

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
. . . .
e. For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so. [N.J.S.A. 10:5-12e.]