**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3335-17

AETNA HEALTH INC. and
AETNA LIFE INSURANCE
COMPANY,

     Plaintiffs-Appellants,

v.

BIODIAGNOSTIC LABORATORY
SERVICES, L.L.C., DAVID NICOLL,
SCOTT NICOLL, KEVIN KEREKES,
CRAIG NORDMAN, DOUG HURLEY,
LUKE CHICCO, CLIFF ANTELL,
PETER BREIHOF, RJA SALES
CONSULTING, INC., DAVID
McCANN, WILLIAM DAILEY,
B.R.M.C. SALES CONSULTANTS,
INC., LEN RUBINSTEIN,
MICHAEL ZARRELLI, KMAN
SALES, LLC, ADVANTECH SALES,
SHANTI CONSULTING, LLC, PJC
CONSULTING, INC., BROWN'S
DOCK CONSULTING, FRANK
SANTANGELO, M.D.,
SANTANGELO MEDICAL
CENTER, DENNIS APONTE, M.D.,
GARY LEEDS, M.D., JOEL
FISCHGRUND, M.D.,
RICHARD GOLDBERG, M.D.,

ANGELO CALABRESE, M.D.,
WAYNE LAJEWSKI, M.D.,
DEMETRIOS GABRIEL, M.D.,
PETER DEPLAS, M.D., EUGENE
DESIMONE, M.D., DOUGLAS
BIENSTOCK, D.O., MICHELE
MARTINHO, M.D., SURENDER
GORUKANTI, M.D., ANTHONY
DELUCA, M.D., RALPH MESSO,
D.O., ANTHONY DELPIANO, M.D.,
GARY SAFIER, M.D., JOHN VITALI,
M.D., FRANZ GOYZUETA, M.D.,
LEONARD MARCHETTA, P.A., and
BRETT HALPER, M.D.,

     Defendants,

and

SUSAN NICOLL and ROBERT W.
KEREKES,

     Defendants-Respondents.

_____

Argued March 10, 2020 – Decided October 7, 2021

Before Judges Messano, Ostrer and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-2994-14.

Matthew A. Baker argued the cause for appellants (Connell Foley LLP, attorneys; Edward S. Wardell, of counsel and on the briefs; Matthew A. Baker and Robert J. Norcia, on the briefs).

Peter W. Till argued the cause for respondent Susan Nicoll (Law Offices of Peter W. Till, attorneys; Peter W. Till and Louis J. Keleher, on the brief).

Kevin H. Marino argued the cause for respondent Robert W. Kerekes (Marino, Tortorella & Boyle, PC, attorneys; Kevin H. Marino and John A. Boyle, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Plaintiffs Aetna Health Inc. and Aetna Life Insurance Co. (collectively, "Aetna") appeal from trial court orders dismissing for failure to state a claim their second amended complaint, and denying as untimely their motion for leave to file a third amended complaint, against father-daughter defendants Robert W. Kerekes ("Kerekes") and Susan Nicoll ("Nicoll").[1] The two were minority owners of Biodiagnostic Laboratory Systems, LLC, ("BLS") which submitted millions of dollars of fraudulent claims to Aetna. David Nicoll ("David") — Nicoll's husband and Kerekes's son-in-law — was BLS's majority owner and was convicted of various federal crimes related to the fraud, along with other Nicoll and Kerekes family members and numerous physicians who participated in the scheme.

---

[1] To avoid confusion, we shall refer to other members of Kerekes's and Nicoll's families by their first names, and we mean no disrespect in doing so.

A-3335-17

Aetna wants to recover over $32 million that BLS distributed to Kerekes and Nicoll. Aetna contends the funds are proceeds of the fraud, and that Nicoll and Kerekes are liable to Aetna under the New Jersey Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A-1 to -30, because they knowingly benefitted from BLS's fraud, see N.J.S.A. 17:33A-4(c), and they failed to disclose the fraud to Aetna, see N.J.S.A. 17:33A-4(a)(5). Aetna also contends that BLS's payments to Nicoll and Kerekes are voidable under the Uniform Fraudulent Transfer Act ("UFTA"),[2] N.J.S.A. 25:2-20 to -34, because BLS made them with the actual intent to hinder, delay, or defraud Aetna, as a BLS creditor. See N.J.S.A. 25:2-25.

The principal question here is whether, in its second amended complaint, Aetna adequately pleaded its IFPA and UFTA claims. We conclude it did, and the trial court erred by failing to read the complaint indulgently, see Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989), by misapplying the heightened pleading standard applicable to fraud claims, see R. 4:5-8, and by misconstruing the meaning of "knowingly" as used in the IFPA.

---

[2] Effective after the transactions here, the UFTA was amended and renamed the Uniform Voidable Transfer Act (UVTA), N.J.S.A. 25:2-20 to -36. L. 2021, c. 92, § 1. Therefore, we refer to the pre-UVTA statute as it was written when the relevant transfers were made.

Because we reinstate the second amended complaint, we remand to the trial court to consider anew Aetna's motion to file a third amended complaint, which would add claims, among others, for restitution, piercing the "corporate veil," and imposition of a constructive trust.

I.

Aetna filed its second amended complaint after the trial court dismissed without prejudice its initial complaint, and Aetna voluntarily dismissed a first amended complaint.[3] As with the initial complaint, Aetna asserts in the second amended complaint claims against Nicoll and Kerekes under the IFPA and UFTA. Aetna also asserts numerous claims against the direct participants in the fraud, including David, Kerekes's son Kevin Kerekes ("Kevin") who was a BLS salesperson, physicians who accepted bribes to funnel business to BLS, and other BLS employees who paid the bribes.[4] Aetna alleges that BLS, through its salespeople and their sham business entities, bribed physicians or paid them

---

[3] As Aetna does not appeal from that order, we shall not address it, nor shall we describe in detail the initial complaint. But we shall refer to the court's decision to the extent the court incorporated its reasoning in dismissing the second amended complaint.

[4] We need not address the claims against the other parties or their disposition. We also do not address a common law fraud claim that Aetna brought against Nicoll and Kerekes because Aetna does not appeal from its dismissal.

A-3335-17

kickbacks to refer Aetna's insureds to BLS for laboratory services. BLS then submitted fraudulent insurance claims to Aetna by billing for services that BLS did not perform, by double-billing, and by waiving patients' copays and deductibles. Aetna included the criminal plea agreements of numerous actors in the scheme.

As for Nicoll and Kerekes, Aetna alleges that as principals and owners of BLS they "orchestrated, directed and/or knew of the bribery scheme," and "knowingly benefitted from the scheme to defraud." Aetna alleges, with supporting documentation, that Nicoll and Kerekes acquired twenty-nine and twenty percent of BLS respectively — and David acquired fifty-one percent — without paying anything out of pocket. The prior owner transferred the company to the three in return for their assuming $200,000 in BLS's debt, and $300,000 taken from BLS's own cash accounts. In return for that insignificant investment in a company that evidently had little value, Nicoll and Kerekes respectively received disbursements from BLS topping $19 million and $13 million over an eight-year period beginning the year following their acquisition. Aetna alleges that under these circumstances, Nicoll and Kerekes knew that BLS was not operating within the confines of the law and knew of the fraudulent scheme. Aetna also alleges that Nicoll and Kerekes were closely related to other family

A-3335-17

members, including David, Kevin, and David's brother, Scott Nicoll, who were directly involved in the fraud.

Furthermore, Nicoll and Kerekes were both personally named in a lawsuit that Horizon Blue Cross Blue Shield of New Jersey (Horizon) brought during the fourth year of their ownership, alleging many of the claims Aetna later raised: that BLS paid kickbacks, double-billed, and waived patient responsibility in a fraudulent scheme. Aetna alleges that Nicoll and Kerekes received exhibits and other evidence supporting Horizon's claims, including a text message exchange between a physician and David. In the exchange, David evidently referred to the bribery, stating he could not "afford the 40-50,000 a month if the girls aren't going to be drawing any blood." Evidencing their efforts to conceal their fraudulent activities, David directed a physician in another text exchange not to send emails about their business because someone already knew too much. Aetna alleges that Horizon dismissed its litigation only after BLS agreed to stop submitting claims to Horizon. However, the fraud against Aetna and BLS's enormous payouts to Nicoll and Kerekes continued.

Aetna alleges that Nicoll and Kerekes "violated the IFPA by (1) concealing and knowingly failing to disclose the occurrence of events which affected BLS's initial or continued right to the insurance payments; and (2)

7

knowingly and directly benefitting from the proceeds derived from a violation of the IFPA." In its UFTA claim, Aetna alleges BLS transferred assets to Nicoll and Kerekes "with the actual intent to hinder, delay, or defraud BLS'[s] present and future creditors including [Aetna]." Aetna alleges that Nicoll and Kerekes did not receive those assets in good faith or for a reasonably equivalent value.

In lieu of an answer, Nicoll and Kerekes moved to dismiss the second amended complaint under Rule 4:6-2(e). And after oral argument, the trial court granted the motion without prejudice.

In connection with the IFPA claim, the court concluded that Aetna did not adequately allege knowledge of the fraud. In so doing, the court appeared to accept defense counsel's suggestion that the Criminal Code's definition of knowledge applied. See N.J.S.A. 2C:2-2(b)(2).

The court also concluded that the circumstantial evidence that Nicoll and Kerekes knowingly benefitted from the fraud fell short of stating a claim. In particular, the court rejected the suggestion that the magnitude of Nicoll's and Kerekes's returns on investment was circumstantial evidence of their knowledge. Referencing evidence outside the complaint that Kerekes had allegedly invested $1 million in BLS, the court opined that Kerekes "expected to get a solid return on his investment. Maybe he wasn't expecting . . . multiples of his investment

but maybe he hit a home run; that does happen." The court also minimized Horizon's complaint and the exhibits attached. The judge stated the complaint failed to put Nicoll and Kerekes on notice of the fraud; and the exhibits were "unimpressive." Evidently referring to Rule 4:5-8, the court stated that Aetna needed to plead fraud "specifically" and Aetna had not done so.

The court did not specifically explain its reasons for dismissing the UFTA claim. But the judge did say Aetna's second amended complaint was not significantly better than its initial complaint, and, regarding that, the court had stated that Aetna failed to plead specific facts to meet the heightened pleading standard for allegations of fraud, and Nicoll's and Kerekes's common status as minority shareholders in a closely held corporation was an insufficient basis to impute knowledge.

Although Nicoll and Kerekes were dismissed from the case, Aetna took their depositions as part of discovery in the case remaining against other defendants. Five months later, Aetna sought leave to file a third amended complaint that repeated IFPA and UFTA claims against Nicoll and Kerekes and added claims for a constructive trust, piercing the corporate veil, and restitution against the two.

In its proposed pleading, Aetna bolsters its claims by alleging additional facts regarding BLS's formation, its operating agreement, Nicoll's and Kerekes's respective backgrounds and levels of sophistication, their incomes from BLS, and the Horizon litigation. Aetna alleges that in the years before the Horizon lawsuit, Nicoll received an 8,196 percent return on investment, or about 262 percent annually. That calculation assumed a $145,000 investment (twenty-nine percent of the $500,000 acquisition cost), even though Nicoll actually paid nothing out of pocket for her stake in BLS. In the same period, Kerekes received a 725 percent return, and ninety-three percent annually on his $1 million investment (which he alleged in his deposition without documentary proof). Aetna also acknowledges Nicoll's deposition testimony that she endorsed every disbursement check back to her husband, David Nicoll, which Aetna alleged was a "badge" of fraud under the UFTA.

Nicoll and Kerekes opposed Aetna's motion for leave to file a third amended complaint, and the court — by a different judge — denied the motion. The court did so on the grounds it was untimely — trial against the other defendants was scheduled to begin the next day — and Aetna had not alleged "any new information, any new facts . . . that would allow for them to be brought in."

II.

We focus on the order dismissing the second amended complaint. Reviewing the order de novo, applying the same standard as the trial court, and owing no deference to the trial court's legal conclusions, Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 108 (2019), we are convinced the trial court erred. In particular, the court misapplied Rule 4:5-8, requiring a heightened pleading in allegations of fraud, and mistakenly imported the Criminal Code's definition of knowingly into the civil IFPA.

We examine the legal sufficiency of the facts alleged on the face of the complaint, assuming the truth of those facts and granting plaintiffs every reasonable inference. Id. at 107; Printing Mart-Morristown, 116 N.J. at 746. We are not concerned with Aetna's "ability . . . to prove the allegation contained in the complaint," Printing Mart-Morristown, 116 N.J. at 746, although it "must plead the facts and give some detail of the cause of action" and may not await discovery to "dredge[] up" missing facts, id. at 768; see also Lederman v. Prudential Life Ins. Co. of Am., Inc., 385 N.J. Super. 324, 349 (App. Div. 2006) (stating "nonparticularized" allegations against defendants were insufficient); R. 4:5-2 ("[A] pleading which sets forth a claim for relief . . . shall contain a statement of the facts on which the claim is based, showing that the pleader is

entitled to relief . . . ."). The dismissal motion must fail "if the claim has been made out." State, Dep't of Treasury ex rel. McCormac v. Qwest Commc'ns Int'l, Inc., 387 N.J. Super. 469, 479 (App. Div. 2006). Applying this liberal standard, Aetna adequately pleaded facts supporting causes of action under the IFPA and the UFTA.

A.

The IFPA "aggressively" combats insurance fraud, N.J.S.A. 17:33A-2, in part by authorizing insurers to pursue private claims for statutory violations, N.J.S.A. 17:33A-7(a); see Liberty Mut. Ins. v. Land, 186 N.J. 163, 173 (2006). Here, Aetna adequately alleges that Nicoll and Kerekes committed two statutory violations.

First, Aetna alleges that Nicoll and Kerekes "conceal[ed] or knowingly fail[ed] to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled." N.J.S.A. 17:33A-4(a)(3).

Second, Aetna alleges that "due to the assistance, conspiracy or urging of any person or practitioner" — that is, BLS and its numerous actors — Nicoll and Kerekes "knowingly benefit[ted], directly or indirectly, from the proceeds

12

derived from a violation of this act," N.J.S.A. 17:33A-4(c), that violation being BLS's numerous acts of fraud.

The "events" that Nicoll and Kerekes allegedly concealed or failed to disclose were BLS's fraudulent acts, including bribes, double-billing, and waiver of patient responsibility. Aetna describes them in great detail, and explains they affected BLS's right to payment. Put another way, Aetna alleges that had it known that BLS bribed doctors, double-billed, and waived patient's copays and deductibles, it alleged it would not have paid the claims.

Aetna also alleges facts supporting its claim that Nicoll and Kerekes "concealed and knowingly fail[ed] to disclose" BLS's fraud; and it "knowingly benefitted" from the fraud. Aetna does so by alleging circumstantial evidence of knowledge, including the astoundingly large disbursements Nicoll and Kerekes received, which were completely disproportionate to their investment or stake in the company. A fact-finder may infer that Nicoll and Kerekes knew something was not on the up-and-up on the simple theory that when something appears too good to be true, it usually isn't.

Aetna was not obliged to allege more. Knowledge is a state of mind that is rarely proved by direct evidence. State v. Lige, 429 N.J. Super. 490, 495 (App. Div. 2013), aff'd o.b., 220 N.J. 20 (2014). In Allstate Insurance Co. v.

13

Northfield Medical Center, P.C., 228 N.J. 596, 620 (2017), the Court concluded that IFPA incorporates a plain language understanding of the term knowing, as opposed to a criminal law definition of that term, which the trial court evidently adopted here. That is: "'Knowing' is well understood to be an awareness or knowledge of the illegality of one's act." Ibid. (citing Black's Law Dictionary 950 (9th ed. 2009)).

The Court also rejected any requirement of direct evidence of knowledge, noting that "[t]here is ample precedent supporting the proposition that a party's knowledge as to the falsity or illegality of his conduct may be inferred from the surrounding factual circumstances." Ibid. Thus, the Court ruled: "In a civil action under the IFPA . . . the defendant's knowledge of a violation may be proven by circumstantial evidence," including, for example, a defendant's demeanor and intellect. Id. at 620-21.

Nonetheless, Aetna presents more direct evidence of knowledge: service of Horizon's complaint and its exhibits, which set forth evidence of BLS's fraudulent business operations. Any defense that Nicoll and Kerekes were oblivious to Horizon's allegations is for a jury. And, while David's texts with a corrupt physician may not have impressed the trial judge, the judge was obliged to assume, extending Aetna all favorable inferences, that the texts would impress

a jury.  See Banco Popular N. Am. v. Gandi, 184 N.J. 161, 184 (2005) (stating, when considering a motion to dismiss, "[t]he issue was not whether the [plaintiff's] allegations were true or whether they could be proved, but only whether they were made").

Rule 4:5-8 did not require a more specific pleading by Aetna regarding the elements of its IFPA claim against Nicoll and Kerekes.  The Rule states, "In all allegations of misrepresentation, fraud, mistake, breach of trust, willful default or undue influence, particulars of the wrong, with dates and items if necessary, shall be stated insofar as practicable."  R. 4:5-8(a).  The Rule is intended to assure that a pleading includes enough facts "to enable the person charged to deny or disprove or explain these facts."  Evangelista v. Pub. Serv. Coordinated Transp., 7 N.J. Super. 164, 168-69 (App. Div. 1950).  Heightened standards of pleading of claims of fraud are designed to accord respect to contracts that such claims are invoked to avoid, to shield potential defendants' reputations, and to deter baseless suits.  See 5A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1296 (4th ed. 2021); 2 James W. Moore et al., Moore's Federal Practice § 9.03 (3d ed. 2021).

Despite its short title, the IFPA is designed to combat insurance fraud by creating causes of action based on less than the elements of common law fraud.

Land, 186 N.J. at 174 (noting "the Legislature in enacting IFPA did not codify common law fraud but rather supplemented that action because, standing alone, it had proven to be insufficient in combating and deterring insurance fraud"). Yet, "allegations that do not involve fraud do not have to be pleaded with specificity," and when such allegations are combined with non-fraud claims, "only the facts supporting the fraud claims must be pleaded with particularity." 2 Moore, § 9.03. Thus, in reviewing a claim under a state's consumer protection law much like our Consumer Fraud Act, N.J.S.A. 56:8-1 to -226, the Seventh Circuit held pleading-with-particularity did not apply to "an allegation of unfair conduct, because fraud is not a required element under that branch of the statute." Benson v. Fannie May Confections Brands, Inc., 944 F.3d 639, 646 (7th Cir. 2019). By contrast, "[a] complaint sounding in fraud" must satisfy Rule 4:5-8. Qwest, 387 N.J. Super. at 484.

Likewise, here, Aetna's claims against Nicoll and Kerekes rest not on the elements of common law fraud, but on their knowing receipt of BLS's fraud proceeds, N.J.S.A. 17:33A-4(c), and their failure to disclose that knowledge, N.J.S.A. 17:33A-4(b)(5). Regarding BLS's underlying fraud, Aetna pleaded facts with great particularity, explaining who, what, when, where, and how the bribes were paid to corrupt physicians and the claims paid for double-billing.

Regarding Nicoll's and Kerekes's knowledge and non-disclosures, pleading with particularity was not required. Indeed, the Rule specifically provides that allegations of "knowledge . . . may be alleged generally." R. 4:5-8(a).

Therefore, we conclude the trial court erred in dismissing Aetna's IFPA claims in its second amended complaint.

B.

Aetna's UFTA claim also passes pleading muster. Aetna alleges that BLS distributed the proceeds of its fraud to Nicoll and Kerekes "with the actual intent to hinder, delay, or defraud BLS'[s] present and future creditors including [Aetna]." In doing so, Aetna relies on N.J.S.A. 25:2-25, which stated:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> a. With actual intent to hinder, delay, or defraud any creditor of the debtor . . . .[5]

5 Aetna does not allege in its second amended complaint, nor does it argue before us, that it may void BLS's transfers under N.J.S.A. 25:2-25(b), because BLS made the transfer

> b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

The UFTA identifies several factors — "badges of fraud" — that "give[]

rise to an inference of intent" to hinder, delay or defraud. Gilchinsky v. Nat'l

Westminster Bank N.J., 159 N.J. 463, 476 (1999); N.J.S.A. 25:2-26. Aetna

relies on two of them: "[t]he transfer or obligation was to an insider," N.J.S.A.

25:2-26(a); and "[t]he value of the consideration received by the debtor was

[not] reasonably equivalent to the value of the asset transferred or the amount of

the obligation incurred," N.J.S.A. 25:2-26(h).[6] With respect to the latter, Aetna

---

> (1) Was engaged or was about to engage in a business
> or a transaction for which the remaining assets of the
> debtor were unreasonably small in relation to the
> business or transaction; or
>
> (2) Intended to incur, or believed or reasonably should
> have believed that the debtor would incur, debts beyond
> the debtor's ability to pay as they become due.

Aetna also does not allege nor argue that it may void BLS's transfers under N.J.S.A. 25:2-27(a), which deems transfers voidable if the creditor's claim "arose before the transfer was made or the obligation was incurred," the transfer was made "without receiving a reasonably equivalent value in exchange," and "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." See Motorworld, Inc. v. Benkendorf, 228 N.J. 311, 316 (2017) (analyzing claim of "constructively fraudulent" transfer under N.J.S.A. 25:2-27(a)).

[6] Other factors include:

> b. The debtor retained possession or control of the
> property transferred after the transfer;

18

alleges in the second amended complaint that Nicoll and Kerekes invested nothing out-of-pocket in return for their receipts of over $19 million and $13 million respectively. Aetna also details their insider status, as both owners and family members. See United Jersey Bank v. Vajda, 299 N.J. Super. 161, 163-

---

c. The transfer or obligation was disclosed or concealed;

d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e. The transfer was of substantially all the debtor's assets;

f. The debtor absconded;

g. The debtor removed or concealed assets;

. . . .

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[N.J.S.A. 25:2-26.]

65 (App. Div. 1997) (discussing the UFTA and stating that "[t]ransfers made to close relatives are especially suspect").

We have found no reported New Jersey case applying Rule 4:5-8's heightened pleading requirements to a fraudulent transfer claim, and the parties cite none. There is some uncertainty in federal courts whether "actual intent" claims require heightened pleading under the comparable federal rule, Fed R. Civ. P. 9(b), because the fraudulent intent is that of the transferor, not the defendant-transferee, see, e.g., Janvey v. Alguire, 846 F. Supp. 2d 662, 675-76 (N.D. Tex. 2011) (noting that the defendant-transferee's "conduct is simply not an element" of the fraudulent transfer claim).

However, even assuming that heightened pleading is required, a party may allege intent generally. R. 4:5-8(a) (stating "[m]alice, intent, knowledge, and other condition of mind of a person may be alleged generally" (emphasis added)). Pleading with particularity pertains not to the transferor's or transferee's state of mind, but to the details of the transfers.[7] "In order to adequately plead a fraudulent-conveyance claim, a complaint must plead 'the

_____

[7] The transferee's state of mind may be relevant as a defense. See N.J.S.A. 25:2-30(a) ("A transfer or obligation is not voidable under [N.J.S.A. 25:2-25(a)] against a person who took in good faith and for a reasonably equivalent value . . . ").

who, what, where, when, and how' of the challenged transactions." <u>United States v. Bame</u>, 778 F. Supp. 2d 988, 992 (D. Minn. 2011).  In other words, "the complaint must allege what (or how much) was transferred, when the transfer was made, how it was made, who made it, who received it, and under what circumstances." <u>In re Wolf</u>, 595 B.R. 735, 763 (Bankr. N.D. Ill. 2018) (quoting <u>In re Glick</u>, 568 B.R. 634, 657 (Bankr. N.D. Ill. 2017)).

Aetna met that test.  Aetna detailed the amounts BLS transferred to Nicoll and Kerekes each year of their ownership of BLS.  Aetna alleged that the payments were made in the form of cash distributions from BLS.  And Aetna alleged the payments were made while BLS was defrauding Aetna, by double-billing, waiving patient responsibility for copays and deductibles, and paying off corrupt physicians — the names and payments of which Aetna identifies in detail.

In sum, the trial court erred in dismissing Aetna's UFTA claims in its second amended complaint.

## III.

We also vacate the trial court's order denying Aetna's motion to file a third amended complaint.  The trial court relied on the false premise that Aetna had failed in its second amended complaint to properly plead its IFPA and UFTA

claims, which Aetna includes in its proposed third amended complaint. Furthermore, the trial court erred in concluding Aetna did not plead "new facts" in its proposed pleading; it added allegations about BLS's formation, its operating agreement, Nicoll's and Kerekes's respective backgrounds and levels of sophistication, their incomes from BLS, and the Horizon litigation. Also, the ill-timing of Aetna's motion was partly a function of the trial court's error in dismissing Aetna's second amended complaint. As a result of that dismissal, Aetna was forced to await third-party discovery in its attempt to allege additional facts, when its previous pleading should have sufficed. Furthermore, restoration of the second amended complaint may prompt additional discovery and affect the timing of any trial.

However, we shall not decide in the first instance the adequacy of Aetna's pleading regarding its new claims as set forth in its proposed third amended complaint. Although motions for leave to amend under Rule 4:9-1 should be granted liberally, even on a remand after appeal, unless undue prejudice would result, Kernan v. One Wash. Park Urb. Renewal Assocs., 154 N.J. 437, 456-57 (1998), such motions are left to the sound discretion of the trial courts, in light of the situation that exists at the time of the motion, id. at 457. "That exercise of discretion requires a two-step process: whether the non-moving party will be

prejudiced, and whether granting the amendment would nonetheless be futile." Notte v. Merchs. Mut. Ins., 185 N.J. 490, 501 (2006). We remand for the trial court to perform that role.

Reversed in part; vacated in part; and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3335-17